No. 10,391.

WILLIS v. PEOPLE.

Decided May 7, 1923.   Rehearing denied June 4, 1923.

Plaintiff in error was convicted of murder.

*Affirmed.*

1.   APPEAL AND ERROR—*Sufficiency of Evidence.* Evidence in a prosecution for criminal abortion reviewed, and held to sustain a verdict of guilty.

2.   CRIMINAL LAW—*Witnesses.* In a criminal trial it is not error for

the court to refuse to require the district attorney to call a witness whose name is endorsed on the information, for the purpose of enabling the defense to cross-examine him.

3. WITNESSES—*Impeachment.* Impeaching questions concerning the truth and veracity of a witness should be confined to an inquiry as to his general reputation in that regard.

*Error to the District Court of the City and County of Denver, Hon. Charles C. Butler, Judge.*

Messrs. IRWIN & FRIEND, for plaintiff in error.

Mr. VICTOR E. KEYES, attorney general, Mr. GEORGE A. CARLSON, for the people.

*Department Two.*

MR. JUSTICE WHITFORD delivered the opinion of the court.

THE plaintiff in error, an osteopathic physician, was convicted and sentenced to a term in the penitentiary for murder resulting from his participation in the commission of an abortion on Mary Park in violation of section 6687, Compiled Laws, and now seeks a review of that judgment by this court.

It is claimed that the evidence was insufficient to warrant a verdict of conviction. A summary of the evidence and surrounding circumstances will be sufficient to show that there is no good foundation for such claim.

The deceased was a school teacher twenty-four years of age. She was a graduate of the State Teachers' College and resided in Greeley with her parents. On August 7, 1917, she left Greeley for Denver. She spent all of the evening of the preceding day with Mrs. Alden, her former school-mate and friend. The deceased on this visit with her friend appeared to be in her usual good health and sound physical condition. On arriving in Denver August 7, 1917, she visited the office of the defendant and Dr. Phelan and informed them that she was pregnant and had been for three months past. The defendant and

Phelan made a physical examination of her person. After the examination the deceased was taken away to the Colonial Hotel at Fifteenth and California Streets. At this time the defendant's partner, Dr. Pickard, was the house physician of the Colonial Hotel. The deceased unaccompanied walked up the stairs to the first floor of the hotel and there held a few moments' conversation at the landing and appeared to be in her usual physical condition. A nurse was employed and she was put to bed. She was able during that day and the following day to leave her bed and go to and from the toilet, situated on that floor, some distance from her room. The defendant stated after the first examination of the deceased by himself and Dr. Phelan, that his partner Dr. Pickard, stated to them, having reference to the case of the deceased, that "we can take care of any trouble that may come up" as "I have a stand-in with the district attorney's office and with Dr. Strickler", the secretary of the state medical board. On the following day, August 8, the deceased requested the nurse to call the defendant and Dr. Phelan; that the defendant and Phelan arrived at the hotel together and had an instrument and medicine case with them; that on the arrival of the doctors at the room of the deceased they requested the nurse to withdraw from the room and that the deceased was then placed under an anesthetic by them. It appears from a statement of the defendant that he and Phelan made an examination of the uterus and performed an operation upon the deceased with instruments by which they removed from the uterus that which they first supposed to be a part of the afterbirth but which later proved to be an intestine protruding through the ruptured wall of the uterus, which was cut off and left in that condition. After the lapse of a half an hour the nurse was recalled to the room by the doctors. The nurse said that the conditions showed that the deceased had been criminally operated on. Afterwards on the same afternoon the defendant sent for a notary public and dictated to him the following statement and had Mary Park sign

and acknowledge it before him shortly before her death, which occurred at three o'clock a. m., the following morning:

"Denver, Colorado, Aug. 9th, 1917.
"To whom it may concern:—

"This is to certify that I the signer of this statement was three months pregnant on or before this date and after attempting to produce a miscarriage was compelled to seek the services of a physician and I called Dr. R. J. Phelan in to attend me.

"This is to exhonerate any attending physicians from any criminal liability."

Dr. Phelan stated to the defendant that he could not put in the death certificate a truthful statement as to the real cause of death, and when the undertaker applied to him for a death certificate before shipping the body to Greeley, Phelan inserted in the death certificate that death was caused by "heart failure caused by gall-stones". The body was shipped to Greeley August 10, and on its arrival there was taken directly to the home of the parents. Mr. Ewing, a lawyer, and cousin of the deceased, was present on the arrival of the body from Denver and accompanied it to the house and assisted his wife in dressing the body, and was present at the funeral and burial and was also present when the body was exhumed and the autopsy performed by Dr. Mugrage in September, 1921, and recognized the body as that of Mary Park. It was discovered when dressing the body for burial, by Mr. Ewing and his wife, that the lower part of the abdomen was covered with adhesive plaster concealing an incision in the abdominal cavity above the pelvis and that the vagina was packed with cotton. Dr. Mugrage testified that the autopsy showed that no incision was made in the region of the gall bladder; that no gall-stones were found, and that an operation for gall-stones could not be performed from the incision found in the abdomen; that the uterus, Fallopian tubes and ovaries had been removed after death and before burial; that the vagina and rectum had been packed

with absorbent cotton.    Following the discovery of the evidence disclosed by the autopsy these proceedings were instituted against the defendant which resulted in his conviction.

From our examination of all the evidence and circumstances as disclosed by the record it seems clear that the evidence was ample to sustain the verdict as returned by the jury.

It is urged that the refusal of the court to require the district attorney to call a witness whose name was endorsed upon the information and then under subpœna, for the purpose of enabling the defendant to cross-examine her, was prejudicial error.   We do not think the rule contended for by counsel is in consonance with sound rules of practice under the laws of this state.   Under modern procedure in criminal causes, and under our statutes, the defendant is not only privileged to testify in his own behalf, but has the right to compulsory process to compel the attendance of witnesses whom he may desire to examine in his defense, and to have the aid of counsel, and when unable to employ counsel because of impecuniosity, to have the assistance of an attorney at public expense.   He is thus under our procedure put on an equality with the people in preparing his defense, by compelling the attendance of witnesses and in producing evidence.   There appears no sound reason for adhering to the old English rule of practice which required the public prosecutor to call all witnesses to enable the defense to cross-examine them which seems no longer of any efficacy in securing the defendant a fair and impartial trial.   *Halderman v. Territory,* 7 Ariz. 120, 60 Pac. 876; *State v. Gardner,* 33 Ore. 149, 54 Pac. 809.

The defendant attempted to impeach one of the witnesses called by the people.   Testimony had been introduced by the defendant to show that his general reputation for truth and veracity was bad, whereupon the defendant propounded this question, "From your knowledge of his reputation would you believe him under oath?"   The form

of the question propounded was technically bad, for the reason that it did not confine the inquiry to general reputation of the witness for truth and veracity. The ruling of the court was without prejudice to the defendant.

We have considered the other assignments of error and have read the arguments of counsel and the entire transcript and are fully persuaded after a full review of the whole record that the plaintiff in error has had a fair trial and has not been prejudiced in any substantial right, and the judgment should therefore be affirmed. Judgment affirmed.

MR. CHIEF JUSTICE TELLER and MR. JUSTICE DENISON concur.