## DAVE POLLOCK v. STATE.

No. A-4344.    Opinion Filed Feb. 27, 1924.
(223 Pac. 210.)

(Syllabus.)

1. **Homicide—Exclusion of Evidence that Deceased Had Something in His Hand When Shot Held Harmless.** In a homicide case, where the plea is self-defense, the defendant offered to prove by a witness that at the time of the killing deceased had something in his hand upraised as if to strike the defendant, but witness did not know and could not testify as to what deceased had in his hand. The witness was permitted to testify that deceased had his hand upraised as if to strike defendant. Held, the refusal of the trial court to permit the witness to further testify that deceased had something in his hand when shot, the nature or description of which witness did not know, was not reversible error. Where it is apparent the witness would not testify that deceased had a knife or pistol or some implement or weapon that would indicate a design to kill or to commit some serious bodily harm to defendant, the proffer merely to prove that he had something in his hand was immaterial to the issue of self-defense.

2. **Trial—Refusal to Require Calling of Eyewitness Whose Name Indorsed on Information Held not Error.** Since defendant may testify in his own behalf and compel attendance of witnesses by compulsory process, and is entitled to the aid of counsel, at public expense if necessary, refusal to require the county attorney to call an eyewitness whose name is indorsed on the information is not error.

3.    **Homicide—That Accused Was Intoxicated Admissible on Issue of Self-Defense.** In a homicide case, where the plea is self-defense, evidence as to whether the accused was intoxicated or under the influence of intoxicating liquors at the time of the homicide is competent for the purpose of aiding the jury to determine whether or not the accused acted under the influence of a well-grounded and reasonable belief that he was in imminent danger of losing his life, or receiving great personal injury.

4.    **Witnesses—In Homicide Case Falsity of Defendant's Denial of Intoxication at Time of Killing May Be Shown by Intoxication a Few Minutes Afterwards.** Where the defendant as a witness denied his intoxication at the time of the killing, it is competent to impeach him by showing his state of intoxication at the time of his arrest within five minutes after the killing.

5.    **Trial—Waiver of Service of List of Witnesses by Failure to Object.** The service of a list of witnesses upon defendant to be used by the state in chief is a matter which the defendant can waive and which he does waive if no timely objection is interposed.

6.    **Same—Waiver of Objection to Unlisted Witness.** Where an incomplete list of witnesses is served upon defendant and the state at the trial calls a witness whose name is not indorsed upon such list, the appropriate time to object is at the time the witness is called to testify; otherwise, the defendant by his own conduct has waived the objection.

7.    **Same—Rebuttal Testimony by Unlisted Witness Held not Error.** Where a witness is called by the state and testifies without objection in chief against the defendant, although his name is not indorsed upon the list of witnesses served upon the defendant, and the court upon motion of defendant withdraws the testimoy of such witness from consideration by the jury and thereafter permits such witness to testify in rebuttal to matters of impeachment against the defendant, a proper foundation having been laid for the reception of such evidence in rebuttal, no error was committed of which the defendant could complain.

8.    **Evidence—Opinion Evidence Invading Province of Jury Properly Excluded.** It is not error to exclude the answer of a witness to a question which it is apparent from the question asked calls for the opinion of the witness on a matter involving an invasion of the province of the jury.

9.    **Instructions Approved.** Instructions examined and considered in connection with the evidence, and the charge as a whole held to correctly state the law of the case.

Appeal from District Court, Tulsa County; Redmond S. Cole, District Judge.

Dave Pollock was convicted of the crime of manslaughter in the first degree and sentenced to serve a term of four years in the state penitentiary, and he appeals. Affirmed.

This is an appeal from a judgment of the district court of Tulsa county, Okla., wherein plaintiff in error, Dave Pollock, hereinafter referred to as defendant, was convicted of the crime of manslaughter in the first degree and sentenced to serve a term of four years in the Oklahoma state penitentiary at McAlester, Okla.

The record discloses that defendant and deceased, Jim Paris, were raised in the same community near Cleburne, Tex., and had been friends since young manhood; that on the day of the alleged homicide, June 1, 1921, each of them resided in what is known as West Tulsa, Tulsa county, Okla., living some three or four blocks apart. The deceased was a married man, as was also the defendant, but at the time of the homicide defendant's wife was away from home. Some time in the afternoon of the day of the alleged homicide, and presumed to be about 3 o'clock, Jim Paris and his wife and two or three other parties started from where deceased lived to go to a place called Turkey Mountain, about five or six miles northwest of Tulsa, for the alleged purpose of looking at some property which one of these parties was on a deal for. They made the trip in a car belonging to a person by the name of Moran with two other parties, Badger or Batchley, and some woman named Guinn. After leaving the home of the deceased they went by Pollock's house, where they stopped, and deceased got out of the car and went inside,

where he remained for several minutes. They then went on to Turkey Mountain, and while they were on the trip drank some whisky. Starting back from Turkey Mountain they stopped at a roadhouse, had a lunch and some "choc beer," and after that came back home, and stopped again at Pollock's place. Paris, his wife, and Miss Guinn got out of the car and went into the house, where they engaged in a conversation in which defendant accused deceased of taking $100 out of his pocket on the first visit made to the home.

Defendant testified that he had just been paid off and had $121 in his pants pocket; that he had been asleep when the deceased came to the house and woke him and asked for change for a $10 bill; that he (defendant) did not get up, but told deceased to look in his pocket and get the change; that soon after this, when defendant got up and dressed, he discovered over $100 of his money was gone. On the return trip from Turkey Mountain, when deceased and his wife stopped at Pollock's house, Pollock accused deceased of taking the money, and they had some angry words concerning it, at which time deceased and his wife, at the request of the defendant, started to leave the house.

They had got outside of the house and off the porch, when defendant, according to the state's witness, called to deceased and asked him to come back, or made some kind of an invitation for him to come back, at which time defendant had appeared in the door, but had not come out on the porch. Deceased turned and went back to the porch near the door, and there were some other words passed between them with reference to the money. Deceased's wife was with the deceased and had hold of his arm or was by his side when defendant pulled a pistol and fired one shot. When the shot was fired, deceased fell over backwards with part of his body extending over the porch but still remaining on this porch.

When this happened, deceased's wife began screaming and started away. Defendant also shortly thereafter started away, leaving deceased lying on the porch. He had not gone very far when an officer who had heard the shot came in contact with him. Defendant still had the pistol in his hand at that time, and gave it to the officer and was taken in charge by the officer. It was also shown that there was but one shot fired, and that the parties first reaching the body of the deceased found him to be unarmed.

The defense interposed was self-defense. The defendant, after having been permitted to testify, among other things, that he had known the deceased intimately for 18 or 20 years, and had lived in the same communities with him during practically all of that time, was permitted to state that deceased had attempted at one time to cut him with a knife, and also to testify about other difficulties which the deceased had had with others than the defendant in which deceased had used a knife, which transactions the defendant claimed he had witnessed, then detailed his version of the matters and things leading up to and which culminated in the killing of Jim Paris.

The following excerpts from the defendant's testimony disclose his version of these occurrences:

"Q. Who was the next person you saw after getting to sleep, and what time was it? A. Mr. Paris about 3 o'clock that afternoon. Q. Where was Mr. Paris when you first saw him? A. He came to my house. Q. Just state to the jury what if anything he did or said when he came to your house? A. He came and knocked on the door and tried to get in, and he came around to the window and woke me up and I got up and let him in. Q. Do you know as a matter of fact whether he had knocked on the door before he came to the window? A. He told me that he did. Q. How? A. He told

me that he did. Q. He told you what? A. Told me he tried to get in at the door and couldn't wake me up and he came to the side door where I was sleeping—the window. Q. You mean the side window or the side door? A. Side window. Q. Did you let him in? A. I did. Q. What if any conversation or what took place between you and Mr. Paris at that time? A. He wanted me to go to a choc joint with him. Q. Just state to the jury the exact language that he used, and the exact language that you used at that time and place? A. Well, when he came in he asked me if I didn't want to go to a choc joint. I told him, 'No;' I couldn't go; I had to come over to town that evening; I had to sleep; I wanted to work that night. Then he asked me, he says, 'I want you to go with me because I am on a little deal; I want you to sanction it.' I says, 'Jim, I can't go, but I will straighten that some other time.' Then he wanted change for a $10 bill. I told him, 'Sure,' to hand my pants, and in place of handing it over he takes this money out himself, turned right around in front of me. There was fifteen $1 bills on the outside of this roll and he counted off nine $1 bills and says, 'I will take these two halves;' he says, 'You won't need them; I need them for change.' I told him, 'All right.' Then he takes his $10 and puts it back around this other roll and puts the rubber around it, and he says, 'I will put this back in your pocket and lay your pants back over there.' Which I thought he did. And we talked a little while, and he pulls out a half pint bottle of whisky and wants to give me a drink. I told him I didn't want any; I would take a drink when I got up. He says, 'I will bring you back some choc if you won't go with us.' I told him, 'All right.' He said the crowd was waiting on him; he would go ahead; and he rushed on out. I went to the door with him and fastened the screen right back like it was. Q. Did what? A. I fastened the screen back, hooked it back. Then he goes on down the street and I turns and goes on back to the room and to the bed. On my way back there I picked up my pants and run my hand in my pocket. There is nine $1 bills, and the halves is all there was in my pants, and the others was gone. It was probably three minutes since he had left when I missed this

money. I put on my clothes and goes down to Mr. Paris' house; thought I would catch him before he went to the choc joint. I goes down there; he had done gone. I went back home and stayed around there till he came back. Q. Just tell the jury in your own way just exactly what ocurred after Mr. Paris came in the house the second time. A. Well, when he came in the second time there, he says, 'I didn't bring you any choc,' he says. 'It wasn't no account,' he says; 'it was too young.' I says, I told him I didn't want any anyhow; I didn't care for any. Then I asked Mr. Paris, I says, 'Didn't you make a mistake when you made the change for that $10 this afternoon?' And he just flies off the handle. 'Don't accuse me of getting your money,' he says, 'Anybody could have got your money.' He says, 'I didn't get it,' he says, 'Don't accuse me of getting it.' I told him, I says, 'Jim,' I says, 'I know you got it.' I says, 'There wasn't nobody here but you.' I says, 'I missed it in three minutes after you was gone,' and tried to explain with him, and he wouldn't stand no explanation at all, only just said he didn't get it, and he didn't want me to accuse him of getting it. Q. Up to that time had you accused him of clandestinely getting your money? A. No; he didn't allow me to accuse him; he denied it at first. Q. You had just asked him at that time if he hadn't made a mistake? A. Yes, sir. Q. All right; go ahead. A. We was chewing the rag for three or four minutes before his wife and Miss Pearl came in. I didn't know there was any one around at all. Q. Just tell the jury exactly everything that happened between you and Mr. Paris, if you haven't done so, that between you and him before the women folks came in. A. There wasn't anything; only we were just arguing about the money. He said he didn't get it, and I was trying to explain with him where he did get it, because I thought that he would give it back to me if he knew that I knew he got it. So when these women came in there wasn't no light lit and I says to some of them, 'Light the lamp,' when these ladies walked in. One of them, I don't know which one, done it; I never paid no mind; one of them lit the light. And we was arguing there about this money, and he said he didn't get it. And I told him, I said, 'Now,

Jim,' I says, 'if you don't give this money back,' I says, 'I never had a man arrested in my life for nothing,' but, I says, 'if you don't, I am going to have you arrested.' And he says, 'Well,' says, I forget now just exactly how he did say that; he says, 'Yes,' he says, 'You copper-hearted son of a bitch; I will cut your head off,' something like that. Q. Was that on the inside of the house? A. That was on the inside at that time and he was standing up very near the middle door. I was setting there in a chair probably a foot or two of the wall plumb across the house from him. He was standing there in the door, and he starts over towards me, and his wife takes hold of his arm, I gets up and kinds of sidles over towards the door away from him. Q. Up to that time had you been standing or had you been sitting? A. I had been sitting all the time. Q. All right. A. I told him, I says, 'Get on out of here, and stay out,' and I said, 'Don't never come back around me any more.' He says, 'I will go when I get damned good and ready.' I told his wife to take him on out, and she did. She was tring to get him to go before that, but he wouldn't go. Then they both went on out. Just as they went out, I told him, I says, 'Jim, I don't want to have you arrested;' I says, 'You better bring that money back or get that all settled.' I says, 'I don't want to have you arrested.' And he just turned around and come back. 'Yes,' he says, 'I will cut your God damned head off now and settle it,' and starts back in the house. When he does that, when he starts back, I jumped to shut the screen door, to hook it. It was already shut, but I jumped to put this hook in there so he couldn't open it. In the meantime I grabbed my gun laying under a pillow on the sofa there. He just grabbed hold of the screen door and jerked it open. Q. With what hand? A. With his left hand, and he had his right hand kind of like that [indicating]; I couldn't tell what he had in it at the time; I couldn't tell what he had in it; but he had his right hand kind of drawed back like that [indicating]. And he jerked the screen open. When he jerked the screen door open and started in, I shot him. I didn't know—I didn't want to kill him, I just wanted to stop him because I knew if he got hold of me he would cut

me up or do me great bodily harm.   Q.   Will you tell the court and jury whether or not he had anything in his hand? A. I couldn't say whether—he had something in his hand, but I couldn't distinguish what it was.  Q.  What did you think it was?   A. I thought it was a knife; that is what I thought it was.''

At the trial of the case the defendant introduced a witness who testified that some three or four days after the killing he found buried in the sand out in the yard a certain penknife which was offered in evidence, and which was directly responsible for one of the errors complained of by defendant's counsel.

It is also shown from the record that the plaintiff in error denied being drunk on the evening of the killing and denied having any whisky in his house; whereupon the state introduced the evidence of a witness who went to the place of the killing early the next day and there found a gallon of corn whisky.  This is the foundation for another of the assignments of error.

The record also discloses that there were but two eyewitnesses to the homicide, Mrs. Paris and Miss Guinn; at least Miss Guinn claims to have seen the killing, but was antagonistic to the state and was introduced by defendant and proved to be a valuable witness to him.  The fact that the state failed to introduce Miss Guinn as a witness is alleged as error, and plaintiff in error sought to force by order of court the introduction of Miss Guinn as a witness by the state under the old English rule that all eyewitnesses must be introduced by the prosecution, and this forms the basis of another assignment of error.

Crossland & Ward, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

MATSON, P. J. (after stating facts as above). The first assignment of error urged by counsel is:

"The learned trial court erred in excluding competent and relevant testimony offered by the plaintiff in error."

Defendant offered Nora (Quinn) Moring as a witness to prove that the deceased came upon the plaintiff in error with a knife at the time of the shooting. The testimony given by said witness is as follows:

"Q. How did he open the bottle of whisky, Mrs. Moring? A. He opened it with a knife. Q. Can you tell the jury what kind of a knife it was? A. Well, it was a knife; I couldn't— right at the time I paid no attention to the knife; I couldn't swear to the knife. I know he did it with a knife. Q. I will ask you to examine that knife and tell the jury whether or not you can testify that was the knife he used in opening the bottle of whisky?

"Mr. Goldsberry: We object to that, your honor, as incompetent, irrelevant, and immaterial at this time for the reason that the witness has testified she didn't know what kind of a knife it was, didn't see it, and paid no attention. A. It was a knife something like that.

"The Court: The objection will be sustained; the answer will be stricken.

"Mr. Goldsberry: We now move that the attempted answer of the question, the portion of the answer to the question, be stricken and the jury instructed not to consider it.

"The Court: It was stricken, and the jury will be instructed not to consider it.

"Q. I will ask you to examine the knife there.

"Mr. Goldsberry: We object to that as incompetent, irrelevant, and immaterial, having the knife examined in the presence of this jury, for the reason that it has never been identified.

"The Court: Overruled.

"Q. You have examined this knife, have you not, that I have in my hand? A. I have. Q. I will ask you to state to the jury if you observed a knife that the deceased used in opening that bottle of whisky sufficiently to determine whether or not it was that same general description of this knife or not?

"Mr. Goldsberry: We object to that, your honor, as leading and suggestive, and for the further reason it is incompetent, irrelevant, and immaterial under the former testimony of this witness.

"The Court: Yes; let her describe what she saw; it is the best evidence.

"Q. Describe the knife as nearly as you can that you saw him use in opening the bottle of whisky.

"Mr. Goldsberry: We object to that as incompetent, irrelevant and immaterial under the former testimony of this witness, for the reason that the witness has previously testified she paid no attention at the time referred to by the question of counsel.

"The Court: Overruled. Read the question. (Question read by the reporter.) A. It was a knife something similar to that, I couldn't say it was the same knife.

"Mr. Goldsberry: We object to that answer and ask that it be stricken as not responsive to the question, and the jury instructed not to consider it.

"The Court: That is a conclusion. That will be sustained.

"Mr. Ward: That is not important enough to quibble long about. We will pass along."

The following additional testimony of the same witness is found in the case-made:

"Q. Do you know whether or not he was doing anything with the door? A. I couldn't tell exactly. Q. Well, did you see anything in Mr. Paris' hand, right hand, when he held it up that way?

"Mr. Goldsberry: Object to that, your honor, as leading and suggestive of the answer.

"The Court: Sustained.

"Q. What did Mr. Paris have in his hand, if anything?

"Mr. Goldsberry: We object to that, your honor, as assuming a fact not in evidence in this case.

"The Court: Overruled.

"Q. What, if anything, did Mr. Paris have in his hand, his right hand, when he raised it? A. I couldn't tell for sure. Q. Do you know whether or not he had anything? Mr. Goldsberry: We object to that, your honor, as incompetent, irrelevant and immaterial.

"The Court: Sustained.

"Mr. Ward: Your honor, we insist that that question is admissible, she said she couldn't tell exactly what he did have in his hand.

"By the Court: Q. Did you see his hand? A. I did.

"The Court: The objection will be sustained.

"Mr. Ward: Her testimony was she didn't know exactly to that effect, what he did have in his hand. My next question is do you know whether or not he had anything in his hand.

"Mr. Goldsberry: I submit, your honor——

"Mr. Ward: I think this is clearly legitimate, competent, and relevant.

"The Court: Sustained.

"Mr. Ward: Exception. For the purpose of the bill this defendant submits that he offers to prove—

"Mr. Goldsberry: We object to any offer being made in the presence of the jury.

"The following offer was made out of the hearing of the jury:

"Mr. Ward: The testimony of this witness will be, if permitted to testify, that she didn't know exactly what was in his hand, but he had something in his hand upraised as if to strike the defendant; she didn't know whether it was a knife or not, but it was something in his hand; she didn't know what it was.

"Mr. Goldsberry: To which offer the state objects, in view of the former testimony of this witness relative to the same subject-matter; it is incompetent, irrelevant, and immaterial.

"The Court: The objection to the tender will be sustained.

"Mr. Crossland: Give us an exception.

"Mr. Ward: We will add to this that the testimony of the defendant will show that the defendant had upraised in that hand at the time we are asking this witness about a knife with which he was endeavoring to assault and do great bodily harm to this defendant or to kill him, and at the very time inquired of did have a knife in his hand.

"The Court: Bearing in mind the foregoing answer of the witness, the objection will be sustained."

It is the refusal of the court to permit this offered testimony above quoted to be introduced of which plaintiff in error complains.

It will be observed that this witness refused to positively state that the deceased had a knife in his hand at the time he was shot, the statement of the attorney being that the

witness, if permitted, would testify that she did not know exactly what was in his hand, but that he had something in his hand. The witness had theretofore stated that she could not tell for sure what the deceased had in his hand, if anything. If the witness was positive in her statement that she did not know what it was if he did have something in his hand, how could defendant have been injured by the refusal of the trial court to permit the witness to testify that deceased had something in his hand? Unless the witness could testify that the deceased had a knife or pistol or some implement or weapon that would indicate a design to kill or commit some serious bodily harm to defendant, the proffered evidence was of little probative force. We cannot see that the refusal of the trial court to permit this witness to add to the testimony which she had already given the further statement that deceased had something in his right hand when shot, the nature or description of which she did not know, was such error, if any, as should result in a reversal of this conviction. Especially do we think this alleged error harmless in view of the fact that defendant himself testified that he "couldn't tell what he had at the time; I couldn't tell what he had in it; but he had his right hand kind of drawed back like that" (indicating).

It is next contended that—

"The trial court erred in not directing the jury to return a verdict in favor of the defendant at the close of the trial, for the reason that he was shown that there was an eyewitness to the transaction who was not related either to the defendant or the deceased, and who was not shown to have been disqualified in any way as a witness, and the state was bound to use her as a witness and failed to do so."

The proceeding here invoked was an attempt to require the state to follow the old English rule of practice which re-

quired the public prosecutor to call all witnesses in order to give the defendant an opportunity to cross-examine them. We do not think the rule here contended for is in accordance with sound rules of practice under the laws as they now exist in this state. Under modern criminal procedure the defendant has so many more privileges than he had at the time the rule here relied upon was established that the reason for the rule no longer exists. The defendant has the right to compel the attendance of his witnesses under our Constitution and statute; he has the right to have the aid of counsel, and when not financially able to employ counsel the court must appoint counsel to defend him at public expense. Thus in effect, under the present criminal procedure, the defendant is practically placed on an equality with the state in preparing his defense. Not so at the time of the establishment of the old English rule. While there are some states which yet follow the English practice, the trend of modern authority is to abandon the rule, and we think that sound reason supports such a course.

In State v. Brady, 124 La. 951, 50 South. 806, it was held: "The state is not bound to examine a witness in whom it has lost confidence." Other decisions may be found to the same effect. In Bloom v. State, 95 Neb. 710, 146 N. W. 965, it is held: "It is not required that all the witnesses whose names are indorsed upon an information must be called at the trial." See, also, People v. Johnson, 13 Cal. App. 776, 110 Pac. 965. And it has also been held not error to refuse to force the prosecution to call eyewitnesses to testify, since it cannot be forced to call any particular witness. Lard v. State, 54 Tex. Cr. 570, 113 S. W. 762; See, also, State v. Hatfield, 65 Wash. 550, 118 Pac. 735, Ann. Cas. 1913B, 835; Willis v. People, 73 Colo. 369, 215 Pac. 854.

We reach the conclusion, therefore, since defendant may testify in his own behalf and compel the attendance of witnesses in his behalf by compulsory process, and is entitled to the aid of counsel at public expense if necessary, that the reason for the old English rule of practice requiring the public prosecutor to call all eyewitnesses to a transaction no longer exists, and that, there being no longer any reason for the rule, but, on the contrary, sound reason why the rule should not be followed, the refusal of the trial court to require the county attorney to call all eyewitnesses to the transaction and thereby vouch for them, was not error.

The next assignment of error is that the court erred in permitting the state to improperly impeach the defendant.

While the defendant was on the witness stand the county attorney asked him, "Did you have any whisky there that evening?" to which defendant replied, "I did not." The defendant was also asked if he had not been drinking and if he was not intoxicated at the time of the killing. Defendant testified that he had not drank anything since early that morning and that he was not intoxicated at the time of the killing, and in rebuttal and as impeachment to this testimony a witness was permitted to testify that at the time of his arrest defendant was intoxicated, it having been shown that he was arrested within five minutes after the killing. The court also permitted the state to show by way of impeachment and to discredit all the defendant's testimony on the subject of intoxication that a gallon of whisky was found in the defendant's house the next morning after the killing. In this connection it was also shown that no one lived in the house with the defendant at that time. In surrebuttal the defendant was permitted to testify that when he was arrested and immediately put in jail that evening after the killing

his house was left open and the door unlocked. We think there was no reversible error in admitting this evidence.

Professor Wigmore says:

"Intoxication, as a mental condition of temporary stupefaction, may be evidenced circumstantially in the same general modes that are available for mental capacity or condition in general. (1) It may be evidenced by the person's conduct. (2) It may be evidenced by predisposing circumstances; i. e., by the drinking of intoxicative liquor. (3) It may be evidenced by his prior or subsequent condition of intoxication within such a time that the condition may be supposed to be continuous."

In Stouse et al. v. State, 6 Okla. Cr. 415, 119 Pac. 271, it is held:

"In a homicide case, where the plea is self-defense, evidence as to whether accused was intoxicated or under the influence of intoxicating liquors at the time of the homicide is competent for the purpose of aiding the jury to determine whether or not the accused acted under the influence of a well-grounded and reasonable belief that he was in imminent danger of losing his life, or receiving great personal injury."

Professor Wigmore also says that intoxication is admissible for purpose of impeachment. Section 933.

It is evident from the foregoing that in cases where self-defense is pleaded the intoxication of the defendant at the time of the killing may be shown for the purpose of aiding the jury to determine whether the accused acted under the influence of a well-grounded and reasonable belief that he was in imminent danger of losing his life or receiving great personal injury. This evidence, therefore, was material in chief. If it was a material matter the defendant could be properly impeached, where he denied his intoxication, by evidence to the contrary, and the circumstance that whisky was

found in his house the next morning after the killing was, under the surroundings of this case, a proper matter for the jury to consider; and where defendant was permitted to deny the knowledge of any such whisky in his house, and where it was shown that the house was left open during the night immediately following the killing, the only question remaining was one for the jury, involving the weight to be given to this circumstance.

Further, it is contended that the court also permitted other evidence to be introduced in rebuttal improperly.

The record discloses that the witness who testified to the matters here complained of was introduced in chief by the state, and after he had disclosed the things here complained of the defendant objected to his testimony and moved to strike it on the ground that his name had not been indorsed on the information or on the list of witnesses served upon the defendant two days before the case was called for trial as required by the Constitution in capital cases. The trial court struck this witness' testimony, and afterwards permitted the state to introduce the witness in rebuttal, the defendant having been theretofore interrogated covering the matters to which the witness subsequently testified in rebuttal.

If any error was committed, the court committed error in the first instance in striking from the consideration of the jury the testimony of this witness in behalf of the state given in chief. The objection interposed that the witness' name had not been served upon defendant in compliance with the constitutional provision came too late. The service of a list of witnesses to be used in chief upon the defendant is a matter which the defendant can waive and which he does waive if no timely objection is interposed. State v. Frisbee, 8 Okla. Cr. 406, 127 Pac. 1091.

In the Frisbee Case it was held that if in a capital case the person prosecuted fails to object before announcing ready for trial that the list of witnesses has not been served upon him, he cannot afterwards avail himself of this objection, and the constitutional right given to him by such provision will be waived. By analogy it follows that, where an incomplete list of witnesses is served upon him in compliance with the constitutional provision and the state at the trial calls a witness whose name is not indorsed upon such list, the appropriate time to object is at the time the witness is called; otherwise, the defendant, by his own conduct, has waived the objection.

In view of the fact that the testimony of the witness here objected to should have been received in chief, and, in view of the further fact that the matter complained of was material and a proper foundation laid for its reception in rebuttal, we find no error in the action of the court in this respect that would authorize a reversal of this judgment.

Further, it is contended that the trial court erred in not permitting a witness who was present at the time of the killing to express her opinion and conclusion that it appeared to her that the defendant was likely to be killed or to receive serious bodily injury at the hands of the deceased at the moment deceased was killed.

The record showing this assignment of error is as follows:

"Q. From your position and from what you saw there and have testified heretofore about, in your opinion what did it look like and reasonably appear to you that Paris was going to do to Pollock?

"Mr. Goldsberry: We object to that, your honor, as incompetent, irrelevant, and immaterial, calling for a conclusion of the witness and leading and suggestive of the answer.

"The Court: The objection will be sustained.

"Mr. Ward: We except to the ruling of the court. The following occurred out of the hearing of the jury.

"Mr. Ward: If permitted to do so, this witness will testify that from the acts and conduct and manner and advance upon the defendant by the deceased that she saw, that it reasonably appeared to her that the defendant was in danger of receiving serious bodily injury at the hands of the deceased, or being killed by the deceased.

"Mr. Goldsberry: To which offer the state objects for the reason it is incompetent, irrelevant, and immaterial, leading and suggestive of the answer and calling for a conclusion of the witness.

"The Court: Sustained.

"Mr. Ward: Exception."

We pass this assignment of error without comment further than to say that, had the court permitted the witness to answer the question, it is apparent from the question itself that the answer necessarily would have involved an invasion of the province of the jury to determine for itself from the facts surrounding the transaction the reasonableness or unreasonableness of the defendant's belief and of the defendant's necessity to shoot at the time.

Certain objections are made to some of the trial court's instructions. The instructions complained of are such as have heretofore been approved by this court in numerous decisions where the issue of self-defense was involved.

We have read the entire charge and carefully considered the same in connection with the evidence, and find the charge as a whole to correctly state the law of the case. In fact, we consider the charge a model one, free from any prejudicial error.

The deceased and the defendant had for many years been friends. They were in the habit of daily associating with each other. The killing occurred in the dark at the defendant's home. The deceased was not wearing a coat, and the defendant claims he shot him because he believed that the deceased at the time intended to kill him or to inflict some serious bodily injury upon him. The defendant does not claim to have seen any weapon of any kind in possession of the deceased at the time he shot him. Both parties evidently had been drinking. Corn whisky and choc beer played an important part in this apparently unnecessary tragedy. To hold that the defendant was justified under the circumstances would do violence to those well-known principles of law which point the way to one about to be attacked to avoid the necessity of taking human life, and especially to use no more force than is apparently necessary at the time.

For reasons stated, the judgment is affirmed.

BESSEY and DOYLE, JJ., concur.