# JIM TRITTHART v. STATE.

No. A-5608.  Opinion Filed July 13, 1926.
(247 Pac. 1111.)

W. H. Kornegay and O. L. Rider, for plaintiff in error.

Geo. F. Short, Atty. Gen., and Houston B. Teehee, Asst. Atty. Gen., for the State.

EDWARDS, J.  The plaintiff in error, hereinafter called defendant, upon a charge of murder in the district court of Craig county, was convicted of manslaughter in the first degree, and sentenced to serve a term of seven years in the state penitentiary. Briefly stated, we gather from the record the facts about as follows:

The defendant and the deceased, Charley Flanders, lived near each other, and each owned some

land under the same pasture fence, and to some extent each was engaged in stock raising. A state of ill will had existed between them which appears to have had its beginning in the fact that defendant had been a witness against deceased in some litigation. Threats appear to have been made by each against the other, and on two occasions the deceased had invited the defendant to an affray, which had been declined. On the day of the homicide, deceased was seen driving some cattle near the pasture and defendant and his brother were engaged in looking after some stock about the same pasture. They met at a point in defendant's part of the pasture, the deceased on horseback, while the defendant and his brother, who were the only eye witnesses, testify that the defendant was on the ground. From the points where the parties met, deceased's horse whirled sharply, and evidently went at a rapid gait for a considerable distance.

On cross-examination, Robert Tritthart, a brother, and called as a witness by the defendant, in part testified:

"* * * Q. Who fired the first shot? A. Jim.

"Q. Did Charley ever fire? A. No, sir.

"Q. Did you see any firearms in Charley's hand A. No, sir.

"Q. Did you see Charley with any firearm there? A. No, sir.

"Q. Did you see Charley's horse when it whirled there to get away from there? A. Yes, sir.

"Q. Did you see any firearm in his hand then? A. No, sir.

"Q. He was in plain view of you then, wasn't he—whirled around toward you, the horse did, and Charley on it? A. He wheeled around, yes, sir.

"Q. Wheeled around toward you, south? A. Yes, sir.

"Q. You were south of him 200 feet where you could see? A. Yes, sir.

"Q. Down in this canyon, in plain view of them? A. No, I wasn't in the canyon; I was up on the bank.

"Q. But you were where you could see them? A. Yes, sir.

"Q. And when the horse whirled, you didn't see any gun about Charley then? A. No, sir. * * *"

The defendant on direct examination testified that he was on the ground when deceased rode up to him and commenced cursing and called him vile names; that he seized hold of deceased's bridle rein; that the horse jerked back six or eight feet, and deceased said: "I will just work you over right here," and started as if to reach for a gun, and defendant then drew his pistol, an automatic, and emptied it at deceased. There were five wounds on the body of deceased, on the right hip and in the rear, one to the left of the backbone, just below the shoulder blade, which made an exit in front near the tip of the breast bone, and two wounds in the left leg. Another bullet was found in the back part of the horn of the saddle on the horse ridden by deceased. After the difficulty, defendant went to the home of his father, the officers were telephoned, and came, and defendant directed them into the place where the body was found. It was lying face upward, the arms extended with an automatic pistol lying near. There were various other details of evidence not necessary to relate which tend circumstantially to cast light on the homicide.

It is first contended that the special prosecutor who conducted the cross-examination for the state

made unfair insinuations, and was guilty of misconduct. The cross-examination was vigorous, and frequently suggested the state's theory of the manner in which the homicide occurred. Most of the matters complained of were not objected to at the time, and where objections were interposed which appear well taken, they were promptly sustained. It is well settled by the frequent holdings of this court that cross-examinations should be limited to legitimate subjects of inquiry, and should not be permitted to become a means of browbeating and intimidating the witness. Here, as stated, the defendant and his brother were the only eyewitnesses. In several particulars the physical facts contradicted their testimony. The state was entitled to a liberal right of cross-examination. We find nothing in the cross-examination materially prejudicial.

The defendant next complains of several of the court's instructions, among them the latter part of No. 5, which is:

"* * * The commission of the homicide by the defendant being proven, the burden of proving the circumstances that justify or excuse it devolves upon the defendant, unless the proof on the part of the prosecution tends to show that the shooting was justifiable or excusable."

It is argued that this instruction, without further instruction defining to what extent the defendant must offer proof of justification, leaves the matter in doubt in the minds of the jury, and is prejudicial. This part of the instruction is the substance of section 2719, Comp. Stat. 1921, and, taken in connection with the instruction upon the presumption of innocence, is not erroneous. Rich v. State, 31 Okla. Cr. 391, 239 P. 183.

Error is also predicated upon the court's instruc-

tion No. 15, which, in substance, states the general law of self-defense, and further advises the jury that the taking of human life is not justified in resisting a nonfelonious assault. This instruction does not follow the language of the statute (section 1754, Comp. Stat. 1921), and is objectionable under the rule announced in the case of Roddie v. State, 19 Okla. Cr. 63, 198 P. 342, wherein it is said, in substance, that a slaying in self-defense is not limited to the resistance of a felonious assault, but that the right exists in resisting an attempt to do "great personal injury" not necessarily amounting to a felony. But, since in this case the only evidence or resistance to an assault at the time of the homicide is that of the defendant that at the time he shot deceased made a movement as if to draw a pistol, that part of the language of the instruction complained of is mere surplusage, and states an abstract proposition which has no application to the facts and could not, we think, have been misleading. It is harmless error.

Complaint is also made that No. 10 of the court's charge, which defines manslaughter in the first degree, is erroneous. This instruction is in the language of the statute (section 1740, Comp. Stat. 1921). Defendant contends that the third subdivision of this section states the only condition in which the homicide could be called manslaughter in the first degree, and hence that part of the charge which states under what conditions a killing "in the heat of passion" constitutes manslaughter is prejudicial as having no foundation in the evidence. It is doubtful if the evidence warranted an instruction on a killing in the heat of passion, since there was no direct evidence of any anger on the part of defendant, unless anger might be inferred from defendant's testimony that immediately before the shooting the deceased

had cursed and applied to him vile and approbrious epithets. However, even if the evidence does not warrant this part of the charge, it is mere surplusage, and is not prejudicial.

It is also argued that instruction No. 20, in which the jury are told that insulting words, conduct, or epithets, no matter how approbrious, at or prior to the time of the killing, will not justify or mitigate the homicide, is error, since there was no claim of justification or mitigation by reason of the evidence of such insulting or opprobrious words or epithets. Opprobrious words and epithets, however, were in evidence, and it was entirely proper for the court to advise the jury that they did not constitute a justification. It is not possible to embody all the laws in a single instruction, and it is proper that different propositions of law be set forth in different parts of the charge of the court. The instructions should be considered as a whole, and single instructions, detached from their connection with other instructions, should not be singled out and the verdict based on that alone, but all should be considered and construed together. Considering the instructions as a whole, we find no error that would warrant this court in disturbing the verdict of the jury. Wilkie v. State, 33 Okla. Cr. 225, 242 P. 1057.

Lastly, it is contended that the evidence is insufficient to sustain the verdict. We do not deem it necessary to review and analyze the evidence in detail beyond the statement heretofore set out, but upon a consideration of the physical facts, that is, the location of the wounds on the person of deceased, the circumstances surrounding the homicide as shown by the evidence, and the testimony of defendant and his brother, present a question of fact for the jury. The inferences arising from the evidence and circum-

stances sustain the verdict of the jury, and from the whole record we are convinced that the defendant had a fair and impartial trial, and the punishment assessed is not excessive.

The case is affirmed.

BESSEY, P. J., and DOYLE, J., concur.