## JOE TOBIN v. STATE.

No. A-7491. Opinion Filed Nov. 15, 1930.
Rehearing Denied Dec. 13, 1930.
(293 Pac. 575.)

Cress, Tebbe & Cress, for plaintiff in error.

J. Berry King, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter for convenience referred to as the defendant, was charged

with the crime of murder; was tried and convicted of manslaughter in the first degree, and his punishment fixed at 10 years in the state penitentiary. Motion for new trial was filed, considered, overruled, and exceptions saved, and the defendant has by case-made and petition in error attached appealed to this court.

The testimony on behalf of the state, in substance, is that the deceased Ross Hurst was a game warden; that the defendant and his wife were living in Perry, Okla., on the 14th day of September, 1928; the deceased was acquainted with the defendant and his wife, and on the evening of the shooting came to the home of the defendant; that the wife of the defendant desired the deceased to take her to her brother's home between Perry and Pawnee; on the road the deceased was driving going to his home in Pawnee; when they arrived at the home of the brother near Morrison, Okla., the wife of the defendant and her brother had a quarrel for some cause not developed by the testimony and the wife requested the deceased to take her back to her home in Perry; they arrived at the Tobin home about midnight.

The testimony further shows that the defendant had no knowledge of where his wife had gone or the purpose of her going, and had no knowledge as to who was with her, if any one; when the defendant returned home about midnight his wife was not at home; soon thereafter an automobile drove up near his home and turned around and went away; from the defendant's statement it was shown that he believed his wife was in the car. The testimony further shows that, when a second car drove up in the yard near the house of the defendant, the defendant took his shotgun and went out to the car and demanded of the driver that he get out of the car with his hands up; that the deceased got out of the car with his hands up;

after the deceased got out of the car on the running board he threw his hand toward his hip pocket as though to get a gun, and the defendant stated he believed the deceased was going after a gun.

There is no controversy between the state and the defendant as to who fired the shot that took the life of Ross Hurst. The testimony shows that no gun was found in the possession of the deceased; that immediately after the deceased got out of the car the defendant fired the shot that took the life of the deceased. The testimony further tends to show that after the shot was fired the defendant left his residence, and about 4:30 a. m., came to the jail in an intoxicated condition and stated to the sheriff he had gone to a bootlegging joint and drank quite a lot of whisky. The officers who went to the home of the defendant shortly after the shooting claim they found whisky on the table and beer or home-brew in the house.

Edna Highfill, called as a witness by the state in rebuttal, and over the objections of the defendant, was permitted to testify that on the 14th day of September, 1928—

"I knew the defendant Joe Tobin and lived a neighbor to the Tobin family; our home was a short distance from the Tobin home, both of the houses face south; on the night of the 13th, or the morning of the 14th of September, 1928, I was at home with the children; at the time the difficulty took place I was in my bedroom; my bedroom was a southwest room; the Tobin house was on the west side of my house; there was a west window in my room and a south window; the first thing that attracted my attention was a car in front of the Tobin house a few minutes before the shooting took place; after the first car drove in when I first saw the defendant he was at the car and had a gun in his hand; I heard the gun snap and the car left going east; after the car left the defendant stepped back on his own porch and was doing

something to his gun; I could see part of his gun; there was a man come out of the house and asked what he was doing with the gun and the defendant replied, 'I know what I am doing,' that was the only words he said; then the defendant said, 'I want that man and I am going to get him too.' The defendant put the gun in the car and left, going east; the man that was talking to him set down on the porch for a few minutes and then went up the road in the direction the cars had gone; later I saw the man that was on the porch and Mr. Tobin return; he made a circle and backed the car up on the west side of the house and got out; after the defendant came back to the porch he sat down on his heels, with his gun on his knees; after that a car came up to the house from the east; as soon as the car was in the yard Mr. Tobin jumped up from the porch and stopped it just as they were making the circle; the car was in the southwest corner of the yard near my house; when the defendant got up from the porch and started toward the car, he said, 'Halt, stick them up. stick them up. Who are you, let's see who you are. Get out of that car and let's see what you are made of.' The car was facing the northeast, and the defendant was on the west side of the car from me; the next that happened a shot was fired, and I heard the defendant say, after the shot was fired, 'Lay there, like the dirty dog you are.' "

On cross-examination the witness stated that in talking to the officers and other persons the next morning she denied she knew anything about the trouble or saw any of it, and stated she did not tell anything she had seen until her husband returned home and she told him.

The defendant testified in his own behalf, stating in substance:

"I knew Ross Hurst in his life time slightly; on September 13th and 14th, 1928, I lived at 819 M street, Perry, Okla.; my house had four rooms and a bath, and fronted south; I slept in the southwest bedroom; there was a door from the porch to this bedroom; the southeast room was

what we called the sitting room, or front room; there was no door between the two south rooms; at the time of the trouble I was conducting the O. K. Automobile Wrecking Company, handling new parts and doing repair work; my family consisted of myself and wife who is about 36 years old; she is a sister of John Prentice; on Saturday afternoon before this happened late Wednesday night or Thursday morning I saw Ross Hurst at my house. In the middle of the afternoon Saturday I had occasion to go home for some tools, and Ross Hurst and my wife were in the front room; they wasn't drinking then but it looked as though they had been, there was a bottle of liquor on the table and glasses; I did not say anything right then to Hurst, I went on to the back room, to where my tools were, and called to her (referring to his wife) to come back there; I asked Hurst if he had any business there; he said he did not know, and I told him, 'Well, I know and I want you to get out of here and not let me catch you here any more.' John Prentice stayed at my house the following Monday night; we had a conversation about Mr. Hurst and he said he knew Hurst, he was a game warden and a pretty tough bird; I was not drinking any that day; I came home about eight o'clock, my wife was not at home; I remained there a short while and went to the fairground in northeast Perry, where a celebration was going on; I left the fairground about 11:30; I drank no liquor while I was at the fairground; as I was leaving I stepped into some kind of a hole and hurt my ankle; it gave me pain, and I hopped along and asked Jim Wright to drive for me; he took me home and said he would stay there as he had no room and would be paying rent if he went anywhere to sleep; we drove down to the Elite Cafe to get some cigarettes; I saw Ernest Cooper and Emmett Delaney but did not talk to them; when we got home my wife had not returned, Mr. Wright went to bed, and I took off my shoes, socks, and pants and lay down on the bed in the front room; before I went to sleep a car drove up in front of the house, a small car but I could not say it was a Ford; I slipped into my pants and shoes and went out on the porch; the car was driving away when I got out;

I hollowed to them to wait a minute I wanted to see them; they apparently did not hear me; I went back and lay down on the bed and probably dropped off to sleep; the next thing I knew there was a car driving in the yard, coming from the east, the car stopped directly in front of my bedroom facing east; while I was slipping my clothes on I heard my wife say something about getting out of the car, and recognized from the tone of her voice she was drinking; I next heard Mr. Hurst ask her when they were going on another jazz party, and she answered, 'We will have to go in the daytime for my old man is at home at night, and if he knows anything he will just raise hell'; and Hurst said, 'Don't worry, if he says anything to me I will kill the son of a bitch,' or that is the words as near as I can remember; when I went out I took a double barrel 16 gauge hammerless gun with me; when I stepped off the porch I had the gun in position and kept the car covered; I walked up to within six feet of the car and told the man to get out of the car with his hands up, which he did; he got out on the running board with both hands up and leaped sideways down to the ground, lowering his hands at the time reaching for his hip pocket; as he did that I fired; he threw his hands to his hip pocket this way (indicating); I fired at his arm not intending to kill him; I did not know he was fatally wounded; I told my wife to get out of the car and go in the house, which she did, and I told the man, who proved to be Ross Hurst, to get in the car and get out and not let me catch him back there any more; he did not seem to have any difficulty getting in the car; he went east, the same way he came there; after that I took my gun in the house, took a blanket and pillow and started for the shop; I went down there but I did not stay; when I heard the conversation between my wife and this man I believed they had been out committing acts of adultery; I have not lived with my wife since the shooting; after the shooting I went to a bootlegging joint and got some whisky and took several drinks."

Jim Wright's deposition was read, in which he, in substance, stated he met the defendant Joe Tobin in the

town of Perry, the night of September 13, 1928; he went to the Tobin home from the fair grounds about 11:30, and lay down about 12 o'clock to get some sleep; he had been in bed about 20 minutes when he heard a car come up to the house; Joe Tobin was sober when he got to his house—

"We did not drink anything after we got home; when this car started away I heard some one say something, I did not see any one at this time, I heard someone say, 'Wait a minute, stop the car, I want to see you.' I was in bed at the time; I was in the front end of the house; the remark sounded like it was right at the door, sounded like it came from the porch; I had not heard Mr. Tobin moving around in the house prior to the time I heard the remark, and after we had gone to bed; as near as I can estimate I was asleep an hour or more when I heard the shot that woke me up."

The testimony in this case is voluminous, but we have set out sufficient testimony to show what occurred at the time of the killing. The transcript covers 555 typewritten pages.

The petition in error of the defendant contains 41 assignments of error alleged to have been committed by the trial court; the defendant in his argument of the errors assigned has presented them under nine propositions of law, which he states fully cover all the specifications set forth in his petition. The first proposition of law that the defendant presents is that, the district court of Noble county having acquired jurisdiction under the Jones commitment, a preliminary attempted to be held in the Woodbury-Long proceeding was without jurisdiction and void. The defendant in the presentation of the law on this proposition argues that the district court was without jurisdiction, for the reason that a complaint was filed against the defendant Joe Tobin, on September 15, 1928, before E. W. Jones, county judge, charging the homicide of Ross

Hurst on the 14th of September, 1928, upon which a preliminary examination was held on the 16th day of October, 1928, after a demurrer to the complaint had been filed and overruled, at which preliminary the defendant was bound over to the district court of Noble county, on a charge of manslaughter, and it is urged by the defendant that by the order of October 16, 1928, the district court immediately acquired jurisdiction of the prosecution, and in support of his contention he cites Muldrow v. State, 16 Okla. Cr. 549, 185 Pac. 332, and Stamper v. State, 25 Okla. Cr. 324, 220 Pac. 67, and many other cases.

It is not disclosed by the record that the county attorney at any time filed an information in the district court based upon the preliminary examination held before Judge E. W. Jones, wherein the defendant was held to answer to the charge of manslaughter. The record does show that on October 16, 1928, after Judge Jones had held the defendant to answer to the district court on a charge of manslaughter, the county attorney filed a complaint against the defendant with Judge C. L. Woodbury, a justice of the peace from Perry, which complaint was afterwards transferred to Judge O. W. Long, and that Justice Long held the defendant to the district court to answer a charge of murder, for the killing of Ross Hurst. Upon this preliminary hearing, and where the defendant was held to answer to a charge of murder, an information was filed in the district court charging the defendant with the crime of murder.

It is further disclosed that the proceedings of the preliminary hearing before Judge Jones, and also the proceeding had before the examining magistrate, O. W. Long, was filed in the court clerk's office, prior to the filing of the information charging the defendant with murder, and

that no information had been filed in the district court charging the defendant with the crime of manslaughter.

It is argued by the defendant that, when the preliminary hearing was held before Judge Jones and defendant held to answer to the district court upon a charge of manslaughter, the county attorney was without authority to institute a proceeding before another examining magistrate, charging the defendant with the crime of murder, for the reason that the defendant had been given one preliminary examination and had been held to the district court upon a charge of manslaughter, and that the examining trial held before O. W. Long, justice of the peace, was without jurisdiction, that the district court could not acquire jurisdiction by the county attorney filing an information based upon the preliminary examination held before O. W. Long as an examining magistrate. The defendant has discussed this question at length, and has cited authorities from different states, which he relies upon to sustain his contention that, when the preliminary examination was held before Judge Jones, the district court acquired jurisdiction, and, as the defendant had been held on a charge of manslaughter, the preliminary hearing before examining magistrate Long was void, and the filing of the proceedings of the examining trial before Judge Long in the district court was without jurisdiction, and that the information filed, predicated upon that preliminary examination, could not confer jurisdiction upon the district court to try the defendant upon a murder charge, as the former preliminary hearing had been held and the defendant held to the district court on a charge of manslaughter.

It is further contended by the defendant that Long was not a justice of the peace, because: First, the town of Billings was under 1,500 population and was not en-

titled to a justice of the peace. Second, that he had not been appointed by the city council of the town of Billings, but by the commissioners of Noble county. Third, that at the time of the transfer of the case he had not the oath of office required to be taken by a justice of the peace. It is admitted in the record that Long had the oath prior to the time he held the preliminary examination and that he had not taken the oath as justice of the peace at the time the case was transferred to him. However, we hold this is not a matter that could be questioned by the defendant since the said justice held the office as justice of the peace of the town of Billings under color of title and was in undisputed possession of the office at the time he held the preliminary examination and had the right to hear the evidence and hold the defendant for trial to the district court.

In Ray v. State, 43 Okla. Cr. 1, 276 Pac. 785, 786, this court in the body of the opinion said:

"This court will not resort to the doctrine of judicial notice as to minor district officers, such as justices of the peace, appointed under section 3420, C. O. S. 1921, except where it is necessary to do so in order to properly and correctly determine the controversy. It is a sufficient answer to defendant's objection to say that the justice of the peace was in possession of the office, assuming to act under color of title, and his acts, therefore, were not subject to collateral attack."

In Ex parte Hand, 13 Okla. Cr. 614, 166 Pac. 449, in the first and second paragraphs of the syllabus, this court said:

"Incorporated towns of less than 1,500 inhabitants are entitled to elect one justice of the peace; said justice of the peace has jurisdiction to sit as an examining and committing magistrate in felony cases for offenses committed within the county where such town is located.

"A person in undisputed possession of the office of justice of the peace and exercising the functions properly belonging thereto under color of title to such office is a de facto justice of the peace, and his official acts are binding on the public and third persons."

The state did not question his title to the office as a de facto justice of the peace, and his official acts are binding upon the public and third persons.

It is also urged by the defendant that examining magistrate, Long, even though a regular qualified and acting justice of the peace, had no authority in this case to commit the said defendant on a charge of murder after a preliminary examination had been had before Judge Jones, and that his acts with reference thereto were void. The defendant in support of his contention has cited a great number of decisions from other states tending to sustain his contention. There are many states that have the rule contrary to the rule laid down by our state. In Kerker v. Superior Court of Pottawatomie County, 38 Okla. Cr. 111, 259 Pac. 146, in the first syllabus, this court said:

"The pendency of an action and the holding of a defendant for trial in one court of the state does not preclude the state from instituting another prosecution for the same offense in a court of concurrent jurisdiction. A plea in abatement or a plea in bar because of the pendency of the prior action will not lie in such latter action."

Therefore the court did not err in overruling the defendant's plea in abatement and motion to quash the information.

The defendant in his second proposition of law contends that examining magistrate, Woodbury, of Perry, was without authority of law to transfer the complaint and papers filed in his court against the defendant, for the rea-

son that he had lost jurisdiction, and that the jurisdiction vested in the next qualified examining, magistrate in the county, and that the action of justice, Woodbury, in transferring the case to O. W. Long, justice of the peace in the Billings district, was without authority of law. We cannot agree with this contention, for the reason that the order transferring the case to justice of the peace, O. W. Long, shows that Judge Jones was disqualified by the county attorney. Justice G. A. Suber's name being indorsed upon the complaint as a witness, O. W. Long was the nearest justice of the peace qualified under the law. There is no merit in the contention of the defendant as to the transfer from the examining magistrate, Woodbury, to O. W. Long.

After a careful reading of the record and reading of the defendant's briefs, the third and fourth propositions of law argued by the defendant are included in the first and do not possess sufficient merit to warrant a reversal of this case.

The fifth proposition presented by the defendant is directed at the action of the court in permitting the transcript of the testimony of C. F. Dowell, given at the preliminary hearing before examining magistrate, O. W. Long, for the reason as contended by the defendant that proper diligence to obtain the presence of the witness was not shown. The record tends to show that the county attorney had a subpoena issued for C. F. Dowell, which had been sent by registered letter to Enid, Garfield county, Okla., the home of the subpoenaed witness, and forwarded to the address of the state witness in Missouri; that a letter was received from the witness, mailed at Curryville, Mo., showing that he was not within the state. We think the showing made by the state was sufficient, and the court did not err in admitting the testimony of the witness.

It is urged by the defendant that the court erred in admitting the testimony of Mrs. Edna Highfill, whose name was not indorsed on the list of witnesses in chief, whose testimony was proper in chief, but not in rebuttal, as a rebuttal witness on the part of the state. The testimony of Mrs. Highfill was testimony that should have been used in chief. However, the question of admitting testimony that would be proper in chief to be used in rebuttal is within the sound discretion of the trial judge, and, unless there has been an abuse of that discretion, the admission of the testimony will not be sufficient to warrant a reversal of the case. The testimony of Mrs. Highfill shows that she lived within a few feet of the home of the defendant where the killing took place, and at the time of the killing was at home; she then details what she saw and heard.

In the case of Bigfeather v. State, 7 Okla. Cr. 364, 123 Pac. 1026, in paragraph 1, subdivision b of the syllabus, the court said:

"The law does not require that the names of witnesses used in rebuttal shall be indorsed on an indictment or information."

In Pollock v. State, 26 Okla. Cr. 196, 223 Pac. 210, in the seventh paragraph of the syllabus, this court said:

"Where a witness is called by the state and testifies without objection in chief against the defendant, although his name is not indorsed upon the list of witnesses served upon the defendant, and the court upon motion of defendant withdraws the testimony of such witness from consideration by the jury and thereafter permits such witness to testify in rebuttal to matters of impeachment against the defendant, a proper foundation having been laid for the reception of such evidence in rebuttal, no error was committed of which the defendant could complain."

In the body of the opinion it is said:

"In view of the fact that the testimony of the witness here objected to should have been received in chief, and, if in view of the further fact that the matter complained of was material and a proper foundation laid for its reception in rebuttal, we find no error in the action of the court in this respect that would authorize a reversal of this judgment."

The rights of the defendant were not prejudiced by the court permitting Mrs. Highfill to testify.

The seventh proposition that the defendant complains of is:

"That the court invaded the province of the jury in giving instruction No. 29, in that he did not submit to the jury the question for their determination as to whether the deceased at the time of the making of the alleged dying declaration was in articulo mortis and was conscious of his dying condition."

In this case the defendant admitted the shooting of the deceased, and other testimony tended to corroborate him; the testimony of the defendant, and the testimony of those who heard the shooting and heard the car drive up and leave, was before the jury.

In Horn v. State, 13 Okla. Cr. 354, 164 Pac. 683, this court said:

"When the instructions of the court properly submit all the issues in the case fairly and impartially, it is not necessary to submit additional requested instructions emphasizing some peculiar phase of the case."

This court has repeatedly held that, where the law contained in the requested instruction is in substance covered in the general charge, it is not error to refuse to give the instruction in the form requested. The instructions

of the court must be considered as a whole, and when considered as a whole and together, if they fairly and correctly state the law applicable to the case, they will be sufficient. Groce v. State, 37 Okla. Cr. 345, 257 Pac. 1108; Sherman v. State, 19 Okla. Cr. 269, 200 Pac. 262.

In Tritthart v. State, 35 Okla. Cr. 41, 247 Pac. 1111, paragraph 2 of the syllabus, the court said:

"Where the instructions as a whole, considered and construed together, contain no fundamental error nor misstatement of law calculated to mislead the jury to the injury of the defendant, the judgment will be affirmed."

The instructions of the court, when considered together, substantially declared the law.

The eighth proposition argued by the defendant is as follows:

"That the trial court erred in giving to the jury instruction No. 24, in that it made the intent of the defendant to provoke the quarrel without any overt act whatsoever sufficient to destroy his right of self-defense."

The contention of the defendant on this proposition cannot be sustained, for the reason that the evidence in the records tends to show that the defendant in this case, whether with or without justification, went to the car of the deceased with a shotgun in his hand and demanded the deceased to get out of his car with his hands up, and, as the deceased got out of the car with his hands up, the defendant fired the shot that took the life of the deceased. This contention of the defendant is without merit.

The ninth proposition of the defendant is as follows:

"That the court did not correctly instruct on the law of self-defense."

Considering all the evidence contained in the record, and after carefully reading the instructions given by the

court, we hold that the instructions of the court, when considered in their entirety, sufficiently covered the law as applied to the facts in the case. The only testimony in the record tending to show that, when the defendant shot the deceased, he anticipated any injury from the deceased, is the testimony of the defendant who says that when the deceased jumped from the running board on the ground he made a move with his hands he had up in the air, and he thought he was going to try to draw a pistol and shoot him.

The defendant was accorded a fair and impartial trial. The court substantially declared the law as applied to the facts in the case. No errors appearing in the record sufficient to warrant a reversal, the sentence and judgment is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.