THE PEOPLE v. WILLIAM J. SCHICK.

*Criminal law—Return of proceedings to circuit court—Information —Forgery—Evidence—Charge to jury.*

1. Where a justice of the peace, before whom a preliminary examination was held, made and entered on his docket all of the findings necessary to confer jurisdiction upon the circuit court if filed with the papers in the case as his return under the statute, a justice to whom such papers and docket are transferred has the right, and it is his legal duty, to certify the same to the circuit court, and an information may be filed thereon.

2. The withdrawal of a former prosecuting attorney from a criminal prosecution after arguing a motion to quash the information and asking a few questions of a witness, even if shown to be in the employ of private persons interested in the prosecution, saves any question under an objection made to his taking part in such prosecution.

3. Where, on a trial of a respondent for forgery, the defense was that the note was drawn by the respondent and delivered to a third party, who returned it, purporting to be signed by the payor by her mark, and that respondent purchased it in good faith ; and the payor denied signing the note, and testified that she could write,—it was error to permit her to write her name upon a piece of paper, and allow the prosecution to introduce the paper in evidence, for the purpose, as claimed, of showing that she could write, and that it was not necessary for her to make her mark.[1]

4. It is error for the court in his charge to the jury to assume, as admitted, a controverted fact in the case.

Exceptions before judgment from Mason.    (Judkins, J.) Argued June 20, 1889.    Decided June 28, 1889.

[1]See *People v. Parker,* 67 Mich. 222.

Information for forgery. Respondent was convicted. Verdict set aside and new trial ordered. The facts are stated in the opinion.

*M. B. Danaher*, for respondent.

*Gilbert H. Blodgett*, prosecuting attorney, for the People.

LONG, J. A complaint was made in this cause by R. P. Bishop, prosecuting attorney for Mason county, before Levi Shackelton, a justice of the peace, charging respondent with forging and also uttering a forged note, knowing the same to be forged. Warrant was issued thereon, and the respondent brought before the justice, when he waived examination, and was held to trial in the circuit court for that county. Before the papers and proceedings had before the justice were returned to the circuit court the justice died, and his docket and other papers came into the hands of Daniel W. Reardon, another justice of the city of Ludington, who made return to the circuit court of the proceedings had before Justice Shackelton.

The return made was the complaint; warrant; bond given by respondent for his appeara c · in the circuit court, reciting the fact that respondent appeared before the justice, waived examination, and was held to trial; and a certified copy of the docket entries of Justice Shackelton, showing the proceedings had by and before him, upon which it appeared that the justice certified under his hand that the defendant waived examination in relation to the complaint, and that it was made to appear to the justice that said offense had been committed, and that there was probable cause to believe that the defendant was guilty thereof, and that he therefore required him to enter into a recognizance to appear before the circuit court at the next term thereof. This bond the defendant gave, and it is the one returned.

Upon this return the information was filed, under which respondent was convicted before a jury.

75 MICH.—38.

It is contended that the circuit court had no jurisdiction; that the information was improperly filed; and that Justice Reardon had no authority to return the proceedings had before another justice. There is no claim made but that Reardon was a justice, and had the lawful custody of these files and proceedings.

There was no error in this. The justice before whom the proceedings were had made all the findings necessary to confer jurisdiction upon the circuit court, namely, that upon the complaint and warrant the defendant appeared before him, waived examination, and that upon the proceedings had before him he had determined that an offense had been committed, and that there was probable cause to believe the defendant guilty thereof. These facts were found and certified by Justice Shackelton under his hand. This was the judicial determination required by the statute, and Justice Reardon, under the statute, having the legal custody of these papers and proceedings, had the authority to certify them to the circuit court. It did not matter that this certificate and finding of the former justice appeared upon his docket. While it may be true that the statute does not require a justice of the peace to keep a docket in criminal cases which are beyond his jurisdiction to try and determine, yet the certificate and finding made in the present case by the former justice was as full and complete as required by the statute of the justice in certifying the cause to the circuit court. If, instead of entering this finding on his docket, Justice Shackelton had made and filed it in the circuit court, it would have met all the requirements of the statute.

Under the circumstances, Justice Reardon had the right, and it became his duty, to certify these papers and proceedings to the circuit court, and upon which the information was properly filed.

At the time the cause came on for trial in the circuit court the term of office of R. P. Bishop, as prosecuting attorney,

had expired, but he entered upon the trial of the cause as assistant to the then prosecuting att rney. Defendant's counsel objected to Mr. Bishop's appearing as prosecutor, for the reason that he was the complaining witness in the case; and also that he took the note for collection, and attempted to collect it from the defendant; and also on the ground that he is the general attorney for the party whom it is alleged in the information the defendant attempted to defraud.

Mr. Bishop, upon being interrogated thereto, denied these charges, and also stated that he appeared by request of the prosecuting attorney, and under an arrangement made with the board of supervisors. He admitted that he had had the note, and told the defendant if he paid it to Mr. Hengstler before prosecution was commenced he would consider the matter.

The court overruled the motion, and permitted Mr. Bishop to remain in the case for the prosecution, and Mr. Bishop then appeared, and argued the motion to quash the information, and also asked a few questions of one of the witnesses produced on the trial, when he withdrew from the cause as one of the prosecutors, and took no further part as such therein. He was afterwards cal.ed as a witness for the prosecution.

It is true that counsel in the employ of private parties interested in the prosecution are not allowed to prosecute in criminal causes, but this is not made to appear, and, even if it were, what Mr. Bishop did in this case we do not think in any manner tended to prejudice the defense, and his withdrawal at this stage of the proceedings from the case saves any question.

Some question is raised that there was a variance between the note described in the information and the note offered in evidence. This objection relates to an erasure appearing

upon the back of the note, which was not set out in the description of the note in the information.

We do not think this objection has any force, and it will not be further considered.

The note in controversy reads as follows:

" No. ————.                         LUDINGTON, Jan. 19, 1887.

" One year after date I promise to pay to the order of Wm. J. Schick one hundred and ten dollars, value received, with interest at ten per cent. per annum.

"Due————.                         MARY ${\overset{\text{her}}{\underset{\text{mark}}{\text{X}}}}$ HUNTLEY.

" $110.00."

Mrs. Mary Huntley was called as a witness by the prosecution, and testified that in January, 1888, was the first she ever saw the note, or knew that such a note was in existence; that she can read and write; and that it was not her signature to the note. Witness was then asked by the prosecution to write her name upon a piece of paper, which she did. This piece of paper, with her signature thereon, was then offered in evidence by the prosecution, for the purpose, as was claimed, to show that she could write, and that it was not necessary, therefore, for her to sign by mark. Under objection of counsel for defendant, the court permitted this to be put in evidence to show that witness could write. If this was the only effect such paper might have upon the case, no error would have been committed, but its effect upon the minds of the jury might not necessarily be limited to that fact.

The claim made by the defendant was that a man by the name of Purdy, who was owing him a balance of some $60 on a deal had between them some time before, came to him and wanted him to buy a note against the Huntleys, which he was about to get in a deal with them; that he, the defendant, drew the note in controversy here, which Purdy took away, and that in about a week he returned it, signed by Mrs.

Huntley by her mark, and defendant paid him for it, paying the difference between the $60 which Purdy owed him and the face of the note. Defendant claims that some two weeks after that he sold the note to Andrew Hengstler, indorsing it without recourse to him.

John Schick, a brother of the defendant, testified in his behalf that he loaned his brother, the defendant, $20, which was used in the purchase of the note from Purdy, and that he saw Purdy let his brother have a note of $110, and he thought this was the note.

Mr. Edward Bogan also gave testimony tending to show that the defendant purchased the note from Purdy, and paid him for it, as defendant claimed. Several witnesses were also called by defendant, and gave testimony that the name of Mary Huntley, written on the note, was not in the handwriting of the defendant.

The people introduced testimony by Mr. Hengstler tending to show that when the defendant sold the note to him he stated to him that he sold a horse to Mrs. Huntley, and she was not satisfied with it, when he sent her another horse, and received the note in controversy; that Mrs. Huntley could not write or read, and had to make a mark, and that a man was along who took the horse, and was a witness to the mark; that Mr. Purdy took the horse down to her, and brought the note back to him; that Purdy saw her make the mark. This witness did not seem to remember much about the words "without recourse," which were erased from the back of the note under the signature of the defendant, but thought they were there when he took the note.

Mrs. Huntley was called as a witness by the prosecution, and testified that it was not her signature to the note, and that she could read and write.

She testified that she saw the defendant at her place sometime in May, 1886, when he came there with a note signed by her husband, which he had given to Mr. Purdy; that defend-

ant wanted her to sign this note, which she refused to do; and that the second time he came, in November or December, he took a horse away from her husband, for which the note was given to Mr. Purdy, and returned the note to her husband when he took the horse; that Mr. Purly was there with him the first time; and that she never had any other dealings with the defendant.

Mr. Bishop, the late prosecuting attorney, was called, and testified that he called the defendant into his office, and talk d with him about this note, when the defendant told him he received it from Purdy, and that he learned from Purdy that Mrs. Huntley could not read or write; that afterwards the defendant came to him, and wanted to pay the note and fix it up, and said if a warrant was served he would kill himself; that he offered to pay the note, and pay the witness well if he would let him fix it up.

Richard Purdy was also called, and testified that he did not take the note from Mrs. Huntley, and did not let the defendant have it; that he never saw the note until long after the time the defendant claims to have received it from him.

Some testimony was also given by the prosecution tending to show that the signature to the note was in the same handwriting as the body of the note.

It was under these circumstances that Mrs. Huntley was asked to write her name, and such signature was put in evidence by the prosecution by permission of the court, under the defendant's objection.

As before stated, the court permitted it for the purpose of showing that Mrs. Hun ley could write. While it was competent to show that Mrs. Huntley could write, it was wholly incompetent to receive her signature in evidence so made, and might have had a strong bearing against the defendant in the minds of the jury. The claim of the people was that the defendant not only uttered the note knowing it to be forged, but also that he was guilty of the forgery; and testi-

mony was given tending to show that the signature was in the same handwriting as the body of the note, which the defendant conceded was his.

The defense set up was that the note was drawn by the defendant, taken away by Purdy, and returned by him to the defendant, purporting to be signed by Mrs. Huntley by her mark; and that defendant bought it in good faith, believing that Mrs. Huntley did sign it, and in reliance upon what Purdy said.

It was not conceded that Mrs. Huntley did not sign the note, or mak her mark thereto, but it was claimed that Purdy broug·t the note with such signature and mark to the defendant, who took it in good faith.

The issu was thus made, and under the testimony it was for the jury to say whether this was so. The whole matter rested between Purdy and the defendant, with the other testimony ar d circumstances surrounding the case to aid the jury in their determination, and it was prejudicial to the defendant to permit the signature of Mrs. Huntley, made there on the trial, to be taken and weighed by the jury in determining the question.

One other question remains. The court in its charge stated to the jury, among other matters:

"If Mary Huntley never signed this note, or authorized the signature, and I believe that is conceded here, she has taken the stand and testified that she never signed it, and never authorized Purdy or Schick, or any one else to sign it," etc.

This was error. It was not so conceded. The fact that defendant claimed not to know who did sign Mrs. Huntley's name to the note, and that Purdy brought the note to him signed, is not a concession that Mrs. Huntley did not sign it.

This was one of the facts to be established by the prosecution by proofs, and whether it was so established was a question of fact for the jury.

The balance of the charge was very fair to the defendant. The case comes here on exceptions before sentence.

The verdict must be set aside for the errors pointed out, and a new trial ordered.

The other Justices concurred.

75  600
96  407

75  600
126  190

75  600
136  395

75  600
144  ¹677

75  600
145  ¹567

75  600
c153 ¹ 22