Mary Kay BORN, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–13321.

Court of Criminal Appeals of Oklahoma.

March 4, 1964.

Rehearing Denied May 20, 1964.

Second Petition for Rehearing Denied Sept. 23, 1964.

Certiorari Denied Feb. 1, 1965.

See 85 S.Ct. 718.

Fred Tillman, Tillman, Tillman & Hampton, Pawhuska, Heskett & Heskett, Bartlesville, for plaintiff in error.

Charles Nesbitt, Atty. Gen., Jack A. Swidensky, Asst. Atty. Gen., for defendant in error.

NIX, Judge.

Mary Kay Born, hereinafter referred to as Defendant, was charged by Information with the crime of Murder in Washington County, State of Oklahoma; was tried before a jury that found her guilty of the lesser and included offense of Manslaughter in the First Degree, and set her punishment at Seventeen (17) years in the Oklahoma State Penitentiary.

The defendant perfected her appeal in this Court within the time prescribed by law asserting numerous assignments of error. They will be discussed as they appear in the briefs of the parties hereto.

The first contention arose from the fact that the County Attorney moved to endorse three witnesses on the Information on the date of trial. Defendant objected and asked for a continuance. The trial judge overruled the motion for a continuance, and this, defendant claims, was reversible error.

The motion to add additional witnesses alleged that the County Attorney with due diligence had not been able to discover said witnesses until four days before trial, or on September 7, 1962. The record reflects that the State served upon defense attorneys, a notice of intent to call additional witnesses, listing their names and addresses thereon. The notice was served by the Sheriff of Washington County upon defense counsel on Saturday, September 8, 1962. The case was set for trial on Tuesday, September 11, 1962.

The Constitution provides in Art. 2, § 20, among other things, that:

" * * * and in capital cases, at least two days before the case is called

for trial, he shall be furnished with a list of the witnesses that will be called in chief, to prove the allegations of the indictment or information, together with their post office addresses."

■ In Manning v. State, 7 Okl.Cr. (367) 368, 123 P. 1029, this Court said:

"The law does not prescribe the manner in which the names of witnesses in a capital case shall be furnished the defendant. If it be made to appear to the satisfaction of the trial court that such names were furnished the appellant at least two days before the case was called for trial, the manner in which the names were so furnished becomes immaterial." State v. Frisbee, 8 Okl. Cr. 406, 127 P. 1091; Franklin v. State, 9 Okl.Cr. 178, 131 P. 183; Goben v. State, 20 Okl.Cr. 220, 201 P. 812; Pollock v. State, 26 Okl.Cr. 196, 223 P. 210.

■ It appears from the record that there was sufficient compliance with Art. 2, § 20 of the Constitution of this State to justify the trial judge in overruling defendant's Motion for a continuance upon the grounds that additional witnesses were endorsed.

The better practice is to not delay serving a list of witnesses until the last minute, as it works a hardship on defense counsel and always creates the danger of reversal. The three witnesses complained of, could, with diligence, have been discovered at an early date by either party. Two of them were nurses and were present when Dr. Born was admitted to the hospital. They were present when he was pronounced dead. They also took Mrs. Born to the nurses station the same night in a wheel chair. The other was a Dr. Neal, a rebuttal witness, who played golf with Dr. Born the afternoon before his death. The allegation in the county attorney's motion to endorse them because they were not discovered until four days before trial is difficult to believe. Nevertheless, he was *barely*

within the time prescribed by law. Therefore it did not constitute error.

Defendant also contends the trial court erred in overruling her motion for a continuance based upon the absence of a material witness. It was alleged, if present, she would testify as to the threats made by the deceased against the defendant, threats to take her life or do her great bodily harm. That he was a moody person and always carried a gun. Defense counsel presented a telegram in support of the witness' being unable to come as a result of the serious illness of her father. The trial judge overruled the motion for continuance and defense counsel saved exceptions.

The witness involved was Mrs. Dorthy Hart of Parsons, Kansas. The telegram from her to counsel states that she couldn't attend court *"tomorrow"* due to the illness of her father. However, it is to be remembered that the trial commenced on the 11th day of September, 1962, and was submitted to the jury on the 19th day of September, 1962. The record does not reflect that any effort was made on the part of the defendant to have this witness present at a later date than the date of presenting motion. A review of the record shows an abundance of testimony by other witnesses to the same effect as Mrs. Hart's testimony would have been, therefore, her testimony was repetitious.

■■ This Court has consistently held that a motion for continuance is within the sound discretion of the trial judge, and this Court will not interfere unless there is a clear abuse of that discretion. Herndon v. State, 35 Okl.Cr. 371, 250 P. 942; Martin v. State, 35 Okl.Cr. 248, 250 P. 552. In the instant case we fail to see where the trial judge abused his discretion in that regard.

Defendant next charges that she was denied a fair and impartial trial for numerous reasons. One of which involved photograph's being introduced into evidence showing the dead body of Dr. Born clad only in shorts, with particular emphasis on the place where the bullet entered. Defendant claims they were ghastly and gruesome and were introduced only for the purpose of inflaming the jury against the defendant.

■ This Court has held that the introduction of photographs taken subsequent to a homicide is largely in the discretion of the trial court and unless this discretion is abused, it will not be cause for reversal. Mott v. State, 94 Okl.Cr. 145, 232 P.2d 166; Jackson v. State, 67 Okl.Cr. 422, 94 P.2d 851.

■ The general rule seems to be that if pictures of a homicide victim made subsequent to his death are gruesome or ghastly, and carry danger of prejudice, they are inadmissible unless they are relevant to some material issue and would reasonably assist the jury in the determination of the defendant's guilt, and this relevancy must outweigh the danger that the jury would substitute emotion for reason as a basis of their verdict.

■ The rule was well stated in the case, People v. Carter, 48 Cal.2d 737, 312 P.2d 665, 667:

"If the principal effect of demonstrative evidence such as photographs is to arouse the passions of the jury and inflame them against the defendant because of the horror of the crime, the evidence must of course be excluded. * * * On the other hand, if the evidence has a probative value with respect to a fact in issue that outweighs the danger of prejudice to the defendant, the evidence is admissible even if it is gruesome and may incidently arouse the passions of the jury."

Also, see People v. Cheary, 48 Cal.2d 301, 309 P.2d 431.

In the instant case the charge arose out of a set of facts indicating a turbulent marriage, marked with violent arguments, harsh threats, and considerable drinking. On the evening in question, the defendant and the deceased had been engaged in one of their not too infrequent arguments, evidently based upon the deceased's willingness to allow the use of his swimming pool, and the

privilege of his house to his ex-wife. During the argument, Dr. Born, the deceased, and the defendant, while in their bedroom, engaged in vociferous argument. In the course of this argument the doctor was shot in the upper portion of the abdomen, and as a result, died. Defendant describes the altercation as follows:

"A. That's right. I was sitting on the edge of the bed.

"Q. Now, were you at that time in any aggressive mood towards him? Did you do or say anything to him out of the way?

"A. No, sir.

"Q. What happened?

"A. Well, that's when he made the statement to me that he would throw my so and so out of the house.

"Q. Now, he did make some statement to you then at that time?

"A. That's correct.

"Q. Was he angry at that time or in an angry mood?

"A. He was angry from the time he came home from the club, but he became more angry at that time.

"Q. Were you afraid of him at that time?

"A. I believe I stated that I had been afraid since I was in California and that incident.

"Q. Please, ma'am, I want to know if you were afraid at that time, also?

"A. Naturally.

"Q. And were you disturbed and afraid because of what he said and what his actions were?

"A. Yes.

"Q. All right. Now, at that time, Mrs. Born, were you in the room where the king-size bed is and where it has the headboard in the bed?

"A. Thats correct.

"Q. Now at that time, was the owl-head pistol in its usual and accustomed place at the head of the bed there?

"A. I didn't notice at that time, no, whether it was there or not.

"Q. Were you sitting on the bed you say?

"A. Thats correct.

"Q. Now, which side with reference to directions, were you sitting on, please, ma'am?

"A. Our bed faced north and south and I was on the right side near the pillow.

"Q. And Dr. Born was on the other side of the bed?

"A. He always slept on the left side.

"Q. That would be which direction?

"A. That would be on the east side.

"Q. East side. Now, Mrs. Born, how was it that he acted there and in what manner was he acting at the time you were sitting on that side of the bed and he was sitting on the other side of the bed with reference to his attitude and demeanor towards you?

"A. Well, that is when he got up off of the bed and came around after me after he made this statement.

"Q. Now just tell us Mrs. Born, whether its pleasing or not, what was it he said he was going to do to you, if you will tell us, please, ma'am.

"A. He made the statement that he was going to throw my so and so out of that house.

"Q. By your 'so and so' you mean some portion of your anatomy, do you?

"A. Thats correct.

"Q. What did he do as he said that to you?

"A. Thats when—

"Q. By way of action?

"A. That's when he got up and came around the bed after me.

"Q. Go ahead.

"A. With his arms and hands extended.

"Q. Extended toward you. What kind of a facial expression did he have that you noticed at that time, Mrs. Born?

"A. He was very angry.

"Q. Now, you have told us heretofore that Dr. Born was an orthodonic surgeon. Tell us, please, ma'am, what kind of a physique that he had, physical appearance I mean, and about how tall he was and his general characteristics physically.

"A. He was six foot tall and what I would call not a real husky man but husky.

"Q. Husky and strongly built, is that your statement?

"A. That would be my statement.

"Q. And, of course, you know that?

"MR. NEPTUNE: Excuse me. I didn't hear her say the statement you said to her. Object to it as incompetent, irrelevant and immaterial and ask that counsel be admonished not to put his statements in the record as the testimony, but let the witness testify.

"THE COURT: Sustained.

"Q. Mrs. Born, I'll have to ask you questions in a certain way. Of course, I'm trying to do that. Just answer my questions, please. What kind of physique, is what I asked you, that Dr. Born had. I believe you have answered that in spite of the objection. That's right—you have answered that?

"A. Yes, I have.

"Q. Now, how tall are you, please, ma'am?

"A. I'm five, eight and three eighths.

"Q. And how tall was Dr. Born?

"A. He was six foot.

"Q. Now can you describe, by reason of his work or his training or for any reason at all, what condition his arms and hands were in at that time? Just explain that, please, ma'am.

"A. Well of course, he worked with his hands in his everyday work. He had husky arms, large hands, if that's what you mean.

"Q. All right. Now, when he came toward you around the bed where did he have to go in order to get to where you were?

"A. He had to come completely around the bed. He * * *

"Q. All right. Now—

"A. (continuing)—he was on the opposite side.

"Q. Thats the bed we are talking about and we have described as being the king-size bed, is that right?

"A. Thats right.

"Q. Now from what part of the bed did he leave or where was he when he started around the bed toward you?

"A. Well, he was lying down on that side of the bed at first and he got up and came around the bed.

"Q. About what distance would he have to travel in order to reach you, please, ma'am?

"A. I'm not sure the width of the bed. It is an oversized bed. We had to special order it.

"Q. Did you move or advance in any manner or anyway towards him?

"A. That's when I grabbed—turned around to see if there was anything to grab. I knew he would do something. He was violent. That's when I picked up the gun and stood up.

"Q. Well, please answer my question. Did you advance towards him or go towards him in any manner, shape or form from your position?

"A. No, sir. I just stood. I was right where I was only standing.

"Q. Now, you then did get the little pistol, the pistol that is in evidence, is that right?

"A. I would have gotten anything. That's all there was.

"Q. Your answer is that you did get that and had it in your hand.

"A. Yes.

"Q. For what purpose did you get that pistol or weapon as you saw it there, Mrs. Born?

"A. Well, I was frightened. It was to defend myself if I saw necessary. However, I purely wanted to bluff him.

"Q. Did you ever point that gun at him?

"A. Never.

"Q. Mrs. Born, are you familiar with firearms, pistols, weapons.

"A. No, sir.

"Q. Did you ever fire a pistol in your life?

"A. No, I have not.

"Q. Did you ever have that weapon in your hand to know anything about its mechanism or how it would discharge or what you would have to do to discharge it?

"A. No, I did not.

"Q. How were you holding the gun? In what position were you when Dr. Born came around to where you were?

"A. I was standing up.

"Q. And where was the pistol, please, ma'am, that you had gotten?

"A. The pistol was over here in this hand (indicating) I had picked it up and crossed it over in my hand.

"Q. Well in what position was it, please, ma'am? Just stand up and show the jury with your hands where the pistol was when he came towards you.

"A. (Demonstrating) It was out like this. Came up here.

"Q. Was it pointed towards him at any time?

"A. No sir. I did not point it towards him.

"Q. Did you ever intend to point it toward him or use it?

"A. I couldn't, no, sir.

"Q. Why not?

"A. Because I loved him. He was my whole life.

"Q. For what purpose did you have the pistol, Mrs. Born?

"A. To protect myself if I had to. I think that's human nature. But purely to bluff.

"Q. All right. Then what happened. What did Dr. Born do with reference to you?

"A. Well thats when he started to scuffle.

"Q. How did he do that? You explain it to us.

"A. Well, he just grabbed my hand and we scuffled around, all around like that.

"Q. Was his grip a strong grip or a weak grip?

"A. Dr. Born was a strong man.

"Q. Was his grip a strong grip on that occasion?

"A. Yes, it was.

"Q. Now, tell the court and jury what happened, please, ma'am, the best you can.

"A. Well, we scuffled over the gun, or scuffled. My hands were going all around and that's when the gun accidentally discharged.

"Q. Do you know whether or not you had your finger on the trigger or near the trigger?

"A. I do not know, sir.

"Q. Do you know whether or not Dr. Born's thumb or finger, or some portion of his anatomy got in the trigger guard while you were gripping the pistol there?

"A. I do not know because it was definitely just a struggle.

"Q. Do you have any idea on earth how it happened to be fired or why it was fired?

"A. No I do not.

"Q. Did you have anything to do consciously or unconsciously with the firing of that pistol? .

"A. No, sir, I couldn't.

"Q. Did you ever intend to fire it?

"A: No, sir."

Throughout defendant's testimony she contended she did not have any intention of firing the shot or taking the life of her husband. That the gun was accidentally discharged in a scuffle and she was not sure who pressed the trigger of the gun that fired the shot.

On the other hand, it was the State's contention by inferences that defendant took the life of her husband while he was lying on the bed. That he offered no resistance and engaged in no struggle. That her actions therefore constituted murder rather than justifiable homicide.

■ It is obvious, therefore, that the bullet wound, with reference to where it entered the body and the direction it traveled became a material issue. Powder marks were material as an indication of the distance from which the gun was fired. The pictures were definitely of some probative value in this regard. They were neither gruesome, ghastly, or bloody; but depicted an actual reproduction of what they purported to reproduce and tended to assist the jury in a very material aspect of the trial. The Court is of the opinion that the pictures were not of such gruesome or ghastly nature as to inflame the jury and the danger of prejudice was not great enough to overcome the probative value.

Therefore, the trial judge did not abuse his discretion in admitting the photographs.

■ Defendant next contends that it was error for the trial court to allow the introduction of the result of an alcoholic blood test taken at the hospital shortly after the homicide. Defendant contends the test was taken without her consent and therefore inadmissable. If the record supported this contention, defendant would certainly have merit to her argument, but the record does not support this assertion. The record reflects that Mrs. Born, the defendant, had refused to let Dr. Johnson take the test, but agreed that Mrs. Hannum could take blood for the test. Mrs. Hannum, at the time, was a registered nurse and administrator of the hospital. She testified as follows:

"Q. Would you as near as you can recall, please Ma'am, tell the court and jury what was said by you to the defendant, Mrs. Mary Born?

"A. I asked Mrs. Born if she would allow me to draw some blood from her arm for a test to be sent to the state, and the reason that they wanted to draw it was to get an alcohol content. And I told her that I must have her permission and that she did not have to have it done, one way or another.

"Q. All, right. And did she answer you?

"A. Yes.

"Q. And what was her answer, please?

"A. She said, 'yes' and stuck her left arm out.

"Q. All right. Then what did you do?

"A. One of the nurses handed me a syringe and a zephrinin sponge and I drew 5 to 8 cc's of blood.

"Q. And out of which—

"A. The left arm.

"Q. All right. What did you do then, Mrs. Hannum?

"A. I put the blood in a vial, as we do, and the police officer and myself went down the stairs to the laboratory and got a container which we have, the routine procedure, and packed it for mailing and I gave it to him. I signed a slip with her name and my name and that I used the zephrinin sponge on it.

"Q. All right. * * *"

It appears that the blood sample was given voluntarily after being advised the purpose for which it was taken. The testimony was that the blood sample contained 0.17 by weight alcohol. Defendant lists no authorities and relies upon a general objection that it was incompetent, irrelevant and inmaterial; and that the test was taken without defendant's consent.

We are of the opinion that the testimony rendered the result of the test admissible. If defendant had refused to let them then take the test, testimony with reference to the refusal would have been inadmissable. In the instant case, she did not refuse, but refused to let *Dr. Johnson* take it because he was evidently a good friend of the deceased. She chose Mrs. Hannum to make the test, which she had a right to do.

The defendant next contends that error was committed by the state in relation to certain statements made by the defendant shortly after the killing occurred. Such as "I shot him"; "Don't let him die". This statement was made in the presence of the ambulance driver, and also repeated at the hospital in the presence of the Hospital Supervisor, a Mrs. Sloan. Defendant contends these statements were not part of the res gestae and were statements against interest and therefore inadmissable.

Defendant cites no Oklahoma case in point, but several may be found holding adversely to her contention. One of these, Jordan v. State, Okl.Cr., 327 P.2d 708, states:

"The state may show by testimony of other witnesses a conversation between a defendant and another party, and it may prove statements made by both the defendant (which are in the nature of an admission against his interest) and by the other party or defendant, but it is for the jury to say from all the conversation whether or not the statement made by the defendant is admission against his interest."

The Jordan case, supra, had a very similar set of facts. Jordan was charged with murder and testimony was admitted where he had said shortly after the alleged homicide: "I don't know why I killed Bill and Lillian, I am sorry".

This statement, like the one in the instant case, constituted declaration from which an inference of guilt may be drawn, and admission against interest and as such are admissible as direct and original evidence. 22A C.J.S. Criminal Law § 730, page 1025, Note 6; 22A C.J.S. Criminal Law § 730, page 1029, Note 7. It has been so held in this Jurisdiction. In Strong v. State, 46 Okl.Cr. 167, 287 P. 1091, 1092, the same ruling is found. Also see Overton v. State, 95 Okl.Cr. 127, 243 P.2d 363; Loudenback v. Territory of Oklahoma, 19 Okl. 199, 91 P. 1030; Jackson v. State, 29 Okl.Cr. 429, 234 P. 228.

Defense counsel further complains that the defendant was denied a fair and impartial trial for the reason that the jury was permitted to separate and they were placed in the office of the county commissioners office, not the regular jury room; and the same being on the floor level with the trial room and were permitted to intermingle with the spectators as it was necessary to pass through the crowds on the way to and from the courtroom.

The record reflects that defendant agreed to the separation of the jury and after the

second week of trial, objected for the first time as is shown by the casemade on page 588:

"MR. TILLMAN: We are going to have to withdraw our acquiescence in the separation of the jurors. There are a number of spectators out there and they have been intermingling with them and all around and we are going to request from this time henceforth the jury, in accordance with the law, be sequestered from the audience, and they have a room to which they can retire during recesses and not be allowed to separate until final submission of the case and until they return a verdict in this case."

The court then admonished the jury that they would thereafter be kept together during the remainder of the trial and thereafter the court admonished the jury at the next recess and also before the case was submitted to the jury as follows:

"THE COURT: Now, with the admonition to the jury about not discussing the case among yourselves or with any other person, and clear from forming any opinion until the case has been completed and you have retired to the jury room to begin your deliberations, we will recess for a few minutes and the Bailiff will notify you when we are ready to resume. At this point, during recesses you will be taken to the so-called jury room here, which is where the County Commissioners hold their meetings."

"The spectators will remain seated until the jury has retired and the Sheriff will clear the hallway of any spectators beyond the entrance to the County Commissioners' room,

"Notify the Commissioners that we desire to use the room earlier than I first informed them."

This procedure was evidently carried out to defendant's satisfaction, as there were no further objection.

It is obvious that defendant's contention is brought as a result of the Oklahoma Statute, 22 O.S.1951 § 857, which reads:

"After hearing the charge, the jury may either decide in court, or may retire for deliberation. If they do not agree without retiring, one or more officers must be sworn to keep them together in some private and convenient place, and not to permit any person to speak to or communicate with them, nor do so themselves, unless it be by order of the court, or to ask them whether they have agreed upon a verdict, and to return them into court when they have so agreed, or when ordered by the court."

The case of Sealy v. State, 59 Okl.Cr. 104, 56 P.2d 903, holds:

"It is the duty of the courts to enforce a strict observance of the provisions of the Constitution and Statutes designed to preserve inviolate the trial by jury, and the purity of jury trials.

*"On proof of a violation* of the provisions of the Code of Criminal Procedure (section 3081, O.S.1931) [22 O.S. 1951 § 857] by permitting the jury to separate after the case has been finally submitted to them, the defendant is entitled to the presumption that such separation has been prejudicial to him, and the burden of proof is on the prosecution to show that no injury could have resulted therefrom to the defendant."

The record in the instant case does not contain any proof of any violation of the above statute. If there were any violations, the defendant should have produced such evidence so the judge could have been properly informed of the same. Where there is proof of violations, prejudice is presumed, and the burden is upon the state to overcome such presumption.

However, there was no such proof in the case at bar, therefore, no presumption is evidenced.

Defendant next contends that error was committed by the jury in that the form of Verdict rendered was improper. The jury returned a verdict of First Degree Manslaughter. The Information charged Murder. The verdict rendered by the jury is as follows:

"We, the jury, drawn, impanelled and sworn in the above entitled cause do upon our oaths find the defendant Guilty of the lesser and included crime, Manslaughter in the First Degree, and fix her punishment at imprisonment in the state penitentiary for a term of 17 (Seventeen) years.

"R. M. John, Foreman"

Defendant cites no cases in support of her contention, but merely contends that defendant was not found guilty of any charge, lesser included, as charged in the Information.

We are governed herein by the Oklahoma Statute, Title 22 O.S.1961 § 916, which reads as follows:

"Included offense or attempt may be found

"The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense."

There are many decisions written by this Court holding that the charge of Murder includes the offense of Manslaughter in the First Degree. See, Berry v. State, 54 Okl.Cr. 154, 18 P.2d 285; also, Jackson v. State, 84 Okl.Cr. 138, 179 P.2d 924.

It was counsel's duty if he had been concerned about the irregularity of the verdict to call it to the court's attention by proper objections. It is true defendant took exception to the verdict but did not state an objection nor state upon what grounds. This Court said in the case of Spencer v. State, Okl.Cr., 275 P.2d 329:

"If counsel for the accused had thought that the verdict was irregular or not in proper form, he should have objected to its sufficiency at the time it was returned into court so as to give the trial court an opportunity to have the verdict corrected before the jury was discharged."

Also, see, Smith v. State, 83 Okl.Cr. 392, 177 P.2d 523; Wilson v. State, 94 Okl.Cr. 189, 237 P.2d 177.

Defendant argues that the court permitted incompetent testimony prejudicial to the defendant's rights. In the following, to wit:

"Q. All right. Doctor, did you make an estimate by degrees, angle degrees of the lateral direction and the horizontal direction of the bullet.

"A. Yes, we felt that this represented a 45° angle between the horizontal plane and the vertical plane in the frontal plant. We felt that this was a 45° angle from front to back in the horizontal plane and a 45° angle in the sagital plane above the horizontal plane. In other words, if we had a cube or box it would bisect the corner angle of the box.

"Q. Doctor, will you, please, sir for the Court and the jury indicate on my body approximately the place of entry and the approximate place from which the bullet was removed?

"MR. TILLMAN: Now we want to make an objection, if your honor please, for the reason and on the ground that there is no evidence to show that Mr. Neptune with his splendid physique is comparable with that of Dr. Born in any respect. And for the further reason that if it is to be done, we want it marked on Mr. Neptune's shirt and the shirt removed and placed in evidence so that we may have it for the purpose of argument.

"MR. NEPTUNE: Your Honor, this is only for the purpose of attempt-

ing to show the jury physically the course of the bullet. I think the request of counsel is not proper.

"MR. TILLMAN: Unless Mr. Neptune intends to remain here with it so we can refer to it I don't think it would be proper.

"MR. NEPTUNE: I'll be here.

"THE COURT: Do you want to introduce him as evidence? I think the objection of the defense is well taken.

"MR. NEPTUNE: Very well, sir.

"THE COURT: I think the Doctor has explained it sufficiently and satisfactorily to the jury by the use of the charts."

Defendant bases his contention of error upon the case of McKee v. State, Okl.Cr., 372 P.2d 243, where it was said:

"Pathologist's testimony as to position of deceased at time bullets entered body was improperly admitted, but admission was harmless where defendant admitted killing, and there was no issue on which the testimony could operate against her."

Also, see State v. Fine, 90 Mont. 311, 2 P.2d 1016; Edge v. State, 39 Okl.Cr. 277, 264 P. 213.

■ It is conceded by this Court that an expert witness cannot testify as to the position of a body at the time the shot was fired nor express his opinion relative to the same, as he would be invading the province of the jury. The rule as laid down in Price v. United States, 2 Okl.Cr. 499, 101 P. 1036, is in line with this Court's opinion:

"It has been uniformly held by the courts that this is not a proper subject for expert evidence. From this it necessarily follows that a physician should not be permitted to testify as an expert to the position of the body of the deceased when the wound was received based upon the range

of the bullet after it entered his body. This is a matter of speculation, with reference to which the opinion of one man is as good as that of another. It was entirely proper for the physician to describe fully the location, character, and range of the wound, but it was error to permit the physicians to go further and give their opinion as to the position of the arm of the deceased at the time of the fatal wound."

The rule, however, is not applicable in the instant case, as the doctor at no time attempted to express his opinion as to what position the deceased was in at the time his body received the bullet, but merely explained the path which the bullet followed through the body and therefore the testimony did not constitute error.

The next contention of error argued by counsel involves the admission of evidence by the State as to the results of a dermol nitrate test. The State offered the results of said test in an effort to refute defendant's theory of the case. The test attempted to show that the deceased's hands contained no nitrates. Defendant contends that the gun was discharged in a scuffle wherein deceased's hands were on the gun. The theory of the nitrate test is that a gun, in being discharged, throws off a chemical called nitrate which is to be found on a person's hands who fires the gun. The nitrate test, according to the state's witnesses, in the instant case, proved negative as to the hands and arms of the deceased. This testimony was presented to refute the inference that deceased fired the gun or that his hands were close to the weapon at the time of discharge. Defendant argues that the dermol nitrate test is inconclusive, far from infallable, or accurate, and therefore inadmissible. Defendant cites as authority for his contention a case decided by the Supreme Court of Colorado, handed down in 1954, Brooke v. People, 139 Colo. 388, 339 P.2d 993, wherein they said:

"The 'paraffin test' designed to reveal whether the person tested had within

recent hours fired a gun has not gained that standing in scientific recognition or demonstrated that degree of reliability to justify courts in approving its use in criminal cases."

Though there was a dissenting opinion in the above case, the majority opinion as to the rationale is well reasoned. The majority opinion distinguishes between the paraffin test and such tests as the blood test, urine analysis, intoximeter, the fingerprint test, etc., stating that one thing in common possessed by those tests is that they have proven irrefutably accurate. In contrast the paraffin test bears no such reputation. Lt. Moomaw in the Brooke case, Supra, testified as follows:

"Q. I believe you stated, testified that the paraffin test is not a positive test. It isn't always accurate in showing just what the substance is; is that correct?

"A. The nitrate test, itself, is not specific for powder burns, that is correct."

The Colorado Court went on to say they had pursued the question further and found in the Journal of Criminal Law and Criminology, vol. 46 (1955–1956) p. 283, a revealing discussion of the unreliability of dermal nitrate tests. Following are some of the pertinent comments:

"It is doubtful that anyone would have sufficient trust in the dermal nitrate test to bring a criminal charge or institute criminal proceedings on the strength of the findings of this test alone. Invariably, there is a mass of other evidence already available, and the dermal nitrate test is done with the hope of corroborating or strengthening the already known facts. Although the series done is admittedly a small one, there is the suggestion that even in experienced hands the test is subject to 13% gross error. For one who might only perform the test very occasionally, the error might be even greater. Such percentage of gross error as above stated makes the test totally unsafe for use where weight is given to the test in determining guilt and a conviction would result in severe penalty.

"The test itself can determine with reasonable accuracy, only whether or not nitrates were present, but this is not what we need know. We actually want to establish whether or not a gun was fired and from this viewpoint, *inconclusive findings must be considered as failures,* (E. g., if 100% of all these tests were inconclusive, then we would know nothing of whether or not a gun was fired, and this test was 100% a failure.) Any lesser percentage of inconclusive findings merely means a smaller proportion of failure to serve its purpose.

"In the sum total of the cases studied, 75% were inconclusive. Coupled with the 13% gross errors, *the test becomes less than worthless.* * * * (Emphasis supplied.) .

"The paraffin glove test for dermal nitrates *is neither sufficiently certain nor* subject to such scientific accuracy as to justify its routine use in establishing whether a suspect or deceased did or did not fire a gun.

"This opinion is based on the evident inaccuracy, even in relatively good hands, and on the fact that the inconclusive findings noted in most of the tests done can too easily be used to offset the weight of other well documented facts of a case at trial."

The Colorado Supreme Court said:

"We hold; therefore, that the result of a paraffin test, rather than being placed in the category of the accepted tests has the same reputation for unreliability as the lie detector test. The authorities, therefore, which deal with the inadmissability of the results of the lie detector tests, or which reject evidence

of a refusal of an accused person to take such a test, are more nearly in point. See Mills v. People [139] Colo. [397], 339 P.2d 998. Also Henderson v. State, 94 Okl.Cr. 45, 230 P.2d 495, 23 A.L.R.2d [1292], 1306."

It is to be noted that at the time the evidence as to the paraffin test was offered in the instant case, defendant failed to object to its admission. Counsel did object after the witness had testified at some length on the grounds that it was improper rebuttal. Defendant at no time objected on the grounds that the paraffin test was neither accurate or infallible.

█ In the Brooke case, Supra, defense counsel abduced testimony as to the inaccuracy of the test and that it was not admissable for the reason it was capable of many fallacies. This contention in the Brooke case was supported by the evidence. In the case before us, there was no such evidence offered to apprise the trial judge of the unreliability of the paraffin test.

█ This writer, however, is inclined to agree with the Colorado Supreme Court in that the paraffin test has not reached that degree of reliability to place it in the same category with fingerprint tests, blood tests, etc. It struck at the very heart of Mrs. Born's defense and if proper objection had been made, it should have been excluded.

The next contention of error argued by defense counsel contains much merit and has given this writer much concern. A special prosecutor appeared in this case and actively participated in the trial. He conducted much of the inquiry and made the closing argument. The beginning of the trial was prefaced with an announcement by the county attorney that he had requested Mr. Robert Neptune to assist him in the prosecution. Defense counsel requested that the special prosecutor reveal his employer. Upon his refusal, the defense counsel asked the county attorney to take the stand. He agreed to testify and was asked the following questions:

"Q. Has Mr. Neptune been appointed as Assistant County Attorney of Washington County?

"A. You mean for all purposes?

"Q. For any purpose?

"A. For the purpose of this case I have made a motion of the court to accept him as a special prosecutor. That is as far as I have gone.

"Q. When was this motion made?

"A. Just at this time.

"Q. Has he presented any credentials to you as Assistant Attorney General of the State of Oklahoma?

"A. No.

"Q. Has he disclosed to you any employment by any person or is he a volunteer counsel in this case?

"MR. CONNOR: This question we would object to as being incompetent, irrelevant and immaterial. It has no bearing on the facts to be decided at this particular time.

"THE COURT: Sustained.

"MR. TILLMAN: Give us an exception to the Court's ruling.

"THE COURT: Allowed.

"MR. TILLMAN: I believe that's all, if your Honor please.

"THE COURT: Do you have anything further to present?

"MR. TILLMAN: Nothing except I desire to file this Motion, if your Honor please, which requires Mr. Neptune, not Mr. Connor, to disclose whom he represents and by whom he is employed. (Copy of Motion given to County Attorney.)

"THE COURT: All right. Are you filing that Motion?

"MR. TILLMAN: Yes, sir."

(Defendant's Motion, filed in open court is in the words and figures, as follows:)

"IN THE DISTRICT COURT OF WASHINGTON COUNTY, OKLAHOMA,

"The State of Oklahoma,
     Plaintiff,

vs.
          No. 3674

Mary Kay Born,
     Defendant,

## "MOTION

"Comes now the defendant, Mary Kay Born, and respectfully moves the court to require Robert H. Neptune to disclose to the court and to counsel for the defendant whom he represents in the above styled case, by whom employed, whether or not he is an Assistant County Attorney, an Assistant Attorney General of the State of Oklahoma or whether he is authorized by any person or persons having the authority to so do to appear for the State of Oklahoma in the above styled and numered cause and in what capacity he appears for and in behalf of the State of Oklahoma which is duly represented by counsel in the person of the County Attorney.

"Wherefore, the premises considered, defendant prays the court to require the above disclosures and in the event they. arenot made to prevent and cause the said Robert H. Neptune from appearing in the trial of this case.

"HESKETT & HESKETT AND
TILLMAN & TILLMAN
By
  Fred ·Tillman   "

---

The Motion was overruled and defense counsel saved his exception.

Defendant failed to dictate into the record an offer of proof showing Mr. Neptune's interest in the case. On appeal, and for the first time, he presents to this Court a certified copy from the court records of Washington County. The records show that Mr. Neptune had represented the previous wife of the deceased in a divorce action. That after the death of the deceased, the probate of his estate was filed in Washington County and Mr. Neptune was appointed Guardian ad litem for the three children of the deceased. Thereafter, the following instruments were filed and action taken by Mr. Neptune as Guardian ad litem, and attorney:

a. On 18 June, 1962, said *guardian ad litcm,* ROBERT H. NEPTUNE,

filed an answer denying each and every allegation of the petition and requesting the appointment of another administrator.

b. On 24 July, 1962, the said *guardian ad litem,* ROBERT H. NEPTUNE, filed a guardians response to motion of MARY KAY BORN regarding joint bank accounts, and stating therein that some " * * * are held in trust for the heirs of the deceased other than MARY K. BORN, subject however to her being convicted upon the charge of causing the death of HAROLD S. BORN, which allegations are made in case No. 3674 in the District Court of Washington County, Oklahoma, in which MARY KAY BORN is charged with murder;

that such heirs are the wards of answering guardian."

c. On 24 July, 1962, the said *guardian ad litem,* ROBERT H. NEPTUNE, filed a response of guardian to application for family allowance and guardian's application for family allowance, and stating therein, " * * * that the applicant MARY KAY BORN, in Case No. 3674, has been bound over for trial in the District Court of Washington County, Oklahoma on the charge of murder of the deceased HAROLD S. BORN, father of said minors; that pending the verdict in such litigation the Court should make no order allowing applicant family allowance; that in event of her conviction, she is not entitled thereto."

d. On 2 August, 1962, the said *guardian ad litem,* ROBERT H. NEPTUNE, filed a notice of appeal from the County Court to the District Court of Washington County, Oklahoma from the order of the County Court which " * * * fixed an allowance * * * to the said MARY K. BORN."

e. On 4 October, 1962, the said *guardian ad litem,* ROBERT H. NEPTUNE, filed a petition to terminate widow's allowance, and stated, "That on September 19, 1962, the said MARY K. BORN was convicted of first degree manslaughter for having caused the death of the said deceased HAROLD S. BORN. That on September 27, 1962, the District Court of Washington County sentenced the said MARY K. BORN to serve a term of seventeen years in the state penitentiary * * * WHEREFORE, petitioner prays the Court make an order terminating the allowances for MARY K. BORN effective September 19, 1962."

f. On 20 November, 1962, the said *guardian ad litem,* ROBERT H. NEPTUNE, filed a response of guardian ad litem which prayed that the court make an order directing the administrator to take possession of the real estate, together with the personal property of the said estate and to terminate the family allowance of the widow, MARY K. BORN.

That said case No. 5652 in the County Court of Washington County, State of Oklahoma, is still pending and that the record nowhere discloses that the said ROBERT H. NEPTUNE has geen removed, discharged or has resigned.

3. That on the 21st day of January, 1963, there was filed in the District Court in and for Washington County, State of Oklahoma, an action for money judgment by JANIS H. BORN and NORMAN FRELING and DORIS FRELING, Trustees, against NATHAN G. GRAHAM, Administrator of the Estate of HAROLD S. BORN, deceased, No. 18849, and that, according to the records of said case and the District Court Appearance Docket No. 57 at page 112, ROBERT H. NEPTUNE, attorney at law, of Bartlesville, Oklahoma, is shown to be the sole and only attorney of record for the said plaintiffs as against said estate and that said case is still pending in said District Court."

An examination of the court record submitted by defense counsel makes it quite apparent that Mr. Neptune had a profound interest in obtaining a conviction of the defendant. His clients stood to benefit by being the sole beneficiaries of deceased's estate in case of a conviction. If defendant had been exonerated, she would have inherited a wife's share, whereas a conviction would have precluded her from participating in the estate.

The Oklahoma Statute is silent as to whether an attorney will be permitted to participate in the prosecution of a criminal

case where he is interested in a civil action arising out of the same facts, and expects to gain financially by a conviction. However, many other jurisdictions have passed on the question. Many states have special statutes prohibiting any attorney with a special interest from participating in the prosecution. A case that covers the subject thoroughly and listing other authorities is that of State v. Jensen, 178 Iowa 1098, 160 N.W. 832, L.R.A.1917C, 455, Supreme Ct. of Iowa. The State of Iowa has a statute precluding a special prosecutor with a civil interest. They said:

"Under Code 1897, § 305, it is sufficient to disqualify an attorney from assisting the state in the prosecution of a crime if the facts in a civil case in which such attorney is interested are somewhat interwoven with the facts stated to be involved in the criminal action."

They further said:

"[D]isqualifying an attorney from acting as assistant prosecutor if he has an interest in a civil action involving the same issues is intended to bar any attorney from serving as public prosecutor who has an interest in a civil action which will make or tend to make him less impartial and less free from bias than the law requires the regular prosecutor to be."

Also, see, Commonwealth v. Williams, 2 Cush. (Mass.) 582; Rounds v. State, 57 Wis. 45, 14 N.W. 865, 866; People v. Schick, 75 Mich. 592, 42 N.W. 1008, 1009; People v. Etter, 72 Mich. 175, 40 N.W. 241; State v. Rue, 72 Minn. 296, 75 N.W. 235; and State v. Ward, 61 Vt. 153, 17 A. 483; Roberts v. People, 11 Colo. 213, 17 P. 637.

It was said in Flege v. State, 93 Neb. 610, 142 N.W. 276, 278, 47 L.R.A.,N.S., 1106:

"that the appointment of a partisan special prosecutor was not in the interest of the fair and impartial trial guaranteed by the Constitution."

In the case of People v. Hurst, 41 Mich. 328, 1 N.W. 1027, holds that the mischief aimed at by the exclusion "[I]s, the prosecution of criminals by counsel who represent private interests, and who cannot be supposed to be impartial."

In Meister v. People, 31 Mich. 99, 107, it is said it must be assumed the Legislature regard it unsafe and opposed to evenhanded justice that it should be made possible "to allow those who have a direct pecuniary interest in convicting a prisoner to take an active part in his trial"; that the Legislature must have considered it improper "to allow the course of the prosecuting officer to be exposed to the influence of the interests or passions of private prosecutors".

It is to be observed that these cases were decided in States having Statutes precluding attorneys with a pecuniary interest from participating in the prosecution. However the Legislative history strongly indicates that said Statutes were based upon the Constitutional right of a person charged with a crime to be prosecuted by a fair and impartial prosecutor.

Though the Statutes of this State maintain silence upon this question, and leave it to the conscience of members of the Bar, it is frowned upon by this Court. It will be called to the attention of the Legislature and a Statute similar to other states should be enacted forever preventing its reoccurrence.

A thorough review of the record does not reveal prejudice on the part of the special prosecutor sufficient to constitute reversible error. We feel, however, that the trial judge should have allowed defendant to prove the special prosecutors interest.

We likewise feel that a re-trial of the case would result in a conviction, but because of the last two errors discussed herein, we are compelled to think that a modification would better meet the ends of Justice.

It is therefore, the opinion of this Court that the judgment and sentence of the trial court should be modified from Seventeen years (17) to Twelve years (12) in the

Oklahoma State Penitentiary and otherwise affirmed; and it is so ordered.

JOHNSON, P. J., concurs.

BUSSEY, J., concurs in part.

BUSSEY, Judge (concurring in part).

While I am in accord with the conclusion of my learned collegue, Judge NIX, that the Judgment and Sentence rendered herein should be affirmed. I am compelled to respectfully disagree with that portion of his opinion relating to the admissibilty of the results of the Dermal Nitrate (Paraffin) Test, and am of the opinion that the results of the Dermal Nitrate Test, in determining the presence or absence of nitrate or nitrate derivatives has attained that degree of reliability as to render its results admissible in evidence. In referring to this test in F.B.I. Law Enforcement Bulletin, October 1935; it is stated:

"\* \* \* At the outset it should be understood that when this test is used and a positive reaction takes place, that is, specks of a blue color are found in the paraffin, the only conclusion that can be drawn is that some nitrate was present on the hand."

In arriving at this conclusion I am not unmindful that nitrate depcsits may be present on the hands or arms of any person who has recently come into contact with any of the following substances; (1) fertilizer, (2) photographic chemicals, (3) metal finishing chemicals, (4) plumber's supplies, (5) costume jewelry, (6) tobacco, (7) tobacco juice, (8) tobacco smoke, (9) urine, (10) firecrackers, (11) cosmetics, (12) bleaching agents, and (13) gunpowder.

In the instant case, the results of the Paraffin Test on the body of the deceased were admitted to establish the absence of nitrate on the hands and arms of the deceased. The absence of nitrate not only tends to establish that the deceased's hands and arms were not near the firearm when it was discharged, inflicting the wound from which he succumbed, it further tends to negate the presence on the hands and arms of; fertilizer, photographic chemicals, metal finishing chemicals, plumber's supplies, costume jewelry, tobacco, tobacco juice, tobacco smoke, urine, saliva, firecrackers, cosmetics and bleaching agents.

In view of the defense interposed in the instant case, the results of the test were of probative value when considered with all of the other facts and circumstances adduced on the trial, and undoubtedly aided the jury in their deliberation.

In conclusion I am of the opinion that the results of the Dermal Nitrate Test are admissible in evidence for the purpose of determining the presence or absence of nitrate or nitrate derivatives, and that it is proper for the jury to consider the results and inferences to be drawn therefrom in the same manner as they are permitted to consider other circumstancial evidence.