George STIDHAM, Appellant

v.

The STATE of Oklahoma, Appellee.

No. F–73–41.

Court of Criminal Appeals of Oklahoma.

July 27, 1973.

Housley & Steidley, McAlester, for appellant.

Larry Derryberry, Atty. Gen., Fred H. Anderson, Asst. Atty. Gen., Linda Frye, Legal Intern, for appellee.

OPINION

BUSSEY, Judge:

Appellant, George Stidham, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Pittsburg County, Case No. F–72–87, for the offense of Murder, his punishment was fixed at life imprisonment and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, James Young, an assistant record officer at the Oklahoma State Penitentiary, testified that the prison records reflect that on May 15, 1972, the defendant was an inmate of the penitentiary. The records further reflect that defendant's inmate number was 82619, that he was six feet, one inch tall, weighed one hundred seventy pounds and was twenty-three years of age when booked into the institution. That the deceased Charles Richardson was received at the penitentiary on July 26, 1971, and was six feet tall, one hundred eighty pounds, and twenty-three years old.

James Cox, a prison guard, testified that at approximately 3:40 p.m. on May 15, 1972, he observed one inmate hitting another inmate in the back. Cox observed the incident from a watch tower approximately seventy or eighty yards away. Because of the distance, he could not identify the attacker, however, he was the only inmate wearing a jacket. He was holding the other inmate with one hand and hitting him with the other. When he turned the victim loose, he sagged to the ground. The attacker pulled out the coat, stuck something under the left arm and walked away. Cox notified the Security Office by telephone.

Gary Bryant testified that on the day in question he had been in the penitentiary approximately ten months on a burglary conviction; that at approximately 3:30 p. m. the defendant's cellmate, Fischer, called Charles Richardson over and started talking to him as they sat down. The defendant came up behind them, reached in his coat and pulled out a hammer and knife. The defendant hit Richardson on the head with the hammer and stabbed him in the back about four times. Defendant then pulled his head back and stabbed him in the throat about five or six times. Defendant ran across the yard and disappeared behind the canteen building. He testified that defendant was the only inmate wearing a blue denim jacket even though it was a hot day, eighty or eighty-five degrees. The defendant had had two or three conversations with Richardson concerning money owed to defendant. He also testified that after the incident, the defendant sent him a note by a runner. He testified that he had known the defendant about six years and at one time they were cellmates together. He had occasion to observe defendant's handwriting, helping him with spelling when defendant wrote letters. From this observation and from other letters defendant had written to him, he could recognize defendant's handwriting. He identified State's Exhibit 1, a note, as being defendant's handwriting. The note was addressed to "Possum Pal" and signed by "Archie". He testified that "Possum Pal" was his name and that "Archie" was the defendant's nickname.

The note read as follows:

"Possum Pal I told my lawyer your name. He will call you out sometime next week or before the 24th to talk to you. You tell him you was under the shed when I come up where Chris and Charlie was setting and Charlie jumped up and pulled a knife when he saw me coming and I hit him with a hammer that I had under my coat, but he pulled a knife first after I hit him with the hammer. I pulled my knife and stabbed him and run. You don't know how many times I stabbed him, but it was more than one. I think we got this beat. Later Archie." (Tr. 53)

He testified that the defendant had asked him shortly before the incident to testify to the same request contained in the note.

On cross-examination he testified that he escaped from the penitentiary after the incident. He denied telling the person who escaped with him that he didn't know anything about the case, but if he was caught, he would testify for the State so he wouldn't be tried for the escape.

Tommy Leroy Bacon testified that on the day in question he was serving sentences for burglary and escape; that he had previously been a cellmate with the defendant, who was called "Archie." At approximately 3:30 p.m. he was standing under the shed by the cellhouse when he heard a noise "like a watermelon breaking." He turned around and observed the defendant sticking a knife into Richardson's throat. The defendant then walked away towards the canteen. He further testified that on August 28, 1972, he was on "weedrow, cell 27" with the defendant. He heard the defendant ask the guard to bring him down to his cell. The guard then took Tommy to the defendant's cell. The defendant told him "the reason that he did what he did was because the guy owed him $25.00. He said he came up behind the guy, he had a claw-hammer in his right hand and a knife in his left. He said he brought the hammer down on the guy's head and then put the knife over and started sticking the guy." (Tr. 81) Defendant asked him to testify that he observed the defendant at the west yard at the time of the killing. The defendant arranged with a "run boy" to take a message to another prisoner.

Bacon told the defendant that he would cooperate, but instead attempted to send a message to Captain Smith. The message was intercepted and brought back to the defendant who attacked him with a broken mop handle.

Dr. Nilo Cater testified that on May 15, 1972, he examined the body of Charles Richardson in the Emergency Room of the State Penitentiary Hospital. He observed numerous traumas and lesions, in his opinion caused by a sharp bladed instrument. He testified that the hospital records indicated that Richardson's blood type was A–Positive and that the defendant's blood type was B–Positive.

Captain Carl Smith testified that at approximately 3:40 p.m. he went to a shed on the east yard and observed an inmate lying face down on the ground with blood on his clothing. As the inmate was placed on a stretcher, he observed a claw-hammer and a pair of cotton gloves underneath his body. He took the hammer and gloves to the Chief Security Office.

Sherman Stockton testified that he was employed as a guard on the afternoon in question. He took Richardson to the hospital and after he was pronounced dead, he took his clothes to the Security Officer, Gordon Wright. At approximately 8:00 p.m. he searched the defendant's and Fischer's cell, looking for a knife. He identified State's Exhibit 3 as being the pants and jacket belonging to the defendant found in the cell.

Gordon Wright, Security Officer of the penitentiary, testified that he gave State's Exhibits 2 and 3 to Detective Coop of the police department and B. G. Smith, Crime Bureau Agent. He testified that he was notified of the incident between 3:30 and 3:40 p.m., at which time he proceeded to the hospital, meeting the defendant coming up the ramp from the west yard toward the lieutenant's desk.

Dr. M. D. Bellamy testified that he was a physician, specializing in pathology, and that he performed an autopsy on the body of Charles Richardson. In his opinion the cause of death was multiple stab wounds. He testified that the wound on the right temple could have been caused by an instrument such as a claw-hammer. In his opinion, the wound to the head would very likely have caused unconsciousness.

Lieutenant Billy Joe Coop testified that he received State's Exhibits 2 and 3 from Gordon Wright and transported them to the State Crime Bureau Lab.

The party stipulated that William J. Caveny would testify that he was a chemist with the Oklahoma Bureau of Investigation, and analyzed the stains on the claw-hammer, the jacket and pants of the defendant and found them to be human blood, type A–Positive and epithelral cells.

For the defense, Ronald Lee Scott testified that he was serving sentences for carrying firearms, pointing firearms at another person and escape; that in August 1972 he and Gary Bryant, known as "Possum", escaped together. Bryant stated that he was not worried about being punished for the escape because he had "an ace in the hole." He said that he would testify against the defendant on the murder charge even though he did not know anything about it.

Jimmy Dan Murray testified that he was serving sentences for burglary and forgery; that on May 15, 1972, he was working in the shower room of the F-Cellhouse. At about 2:30 or 3:00 p.m., "Possum" came into the shower room and took a shower. He remained there until after 3:00 p.m. Prior to Possum leaving, some men came in and were talking about a stabbing.

Chester Dale McDonald, an inmate in the penitentiary, testified that prior to May 15 Tommy Bacon made "the statement that if he could find out anything inside the penitentiary and tell the officials, to make him trustee he would do it." (Tr. 200) he further testified that he knew Tommy Bacon's reputation for truth and veracity to be bad among the inmates. He admitted convictions for burglary, checks, car theft, burglary, murder and rape.

Joseph Sever testified that he was serving a sentence for armed robbery and had four prior convictions; that in May 1972 he was the "run boy on weedrow;" that weedrow was a punishment area in the penitentiary and that a run boy takes food to the prisoners and picks up mail and messages. He picked up a letter from Tommy Bacon addressed to Captain Smith. He testified that he opened the letter and read it and that it did not contain a request for an interview with prison officials to talk about the murder case.

Lee Cagle testified that he was serving a sentence for burglary in the second degree and had four other convictions; that on the day prior to the stabbing incident, he was playing dominoes with defendant when Richardson walked up to the table. Richardson opened his shirt and displayed a knife in his belt. Richardson slapped the knife and said "before I pay you." (Tr. 220)

A week earlier Cagle was again playing dominoes with the defendant when Richardson · came up behind the defendant and said "I am going to be in your face from now on." In prison terminology, Richardson's acts constituted a threat against defendant's life.

Gary Moore testified that he was serving a sentence for selling LSD; that on May 14 he was playing dominoes with the defendant when Richardson walked up to the side of defendant, opened up his shirt, patted a knife and told defendant "that he was paid." He testified that if this statement had been made to him, he would take it to mean that he should get a weapon to defend himself.

Danny Ray Roberts testified that he was serving a sentence for armed robbery; that at about 3:30 p. m. on the afternoon in question, he was standing near the officers' mess where he had a view of the shed. Two inmates were sitting in the shed talking when the defendant came up from the direction of the lieutenant's office. When the defendant got within seven or eight feet, one of the inmates got up, pulled a knife out of his shirt and started toward "Archie." The defendant pulled a hammer from the back of his coat and hit the inmate "upside the head." The defendant took the knife away from the other guy and stabbed him.

James Bennett testified that he was serving a sentence for perjury and had five other convictions; that at about 3:30 p. m. he was standing approximately twenty-five

feet from the shed and observed Richardson sitting under the shed talking to some blond headed guy. The defendant started walking toward the shed when Richardson jumped up, pulled a knife and started slapping at the defendant. Defendant pulled a hammer from the back of his pants and struck Richardson.

Oliver Cromwell Hardee testified that he was serving a sentence for armed robbery and had three prior convictions; that at about 3:30 p. m. on the afternoon in question, he was talking to some guys near the guards' mess. Charles Richardson was sitting under the shed talking to a boy named Chris. As the defendant walked under the shed, Richardson jumped up, pulled a knife and started toward the defendant, who then pulled a hammer from under his clothes. He told the boy he was talking to "let's go" and they left because he did not want to get involved.

The defendant testified that he was serving a life sentence for murder; that he had other convictions for forgery, burglary and kidnapping. He testified that Richardson owed him twenty-five dollars from a poker debt. Richardson also had debts with other people. Defendant bought those debts so Richardson would owe only him. He had several conversations with Richardson concerning the debts, and that Richardson said that he would pay him when he got "damn good and ready." On the day before the incident while he was playing dominoes, Richardson came up, displayed a knife and said that the best thing to do about that money is "just to forget about it." (Tr. 296) He tried to talk to Richardson who said "Well if you are going to be that way just go on and catch your protection, you know, don't come on the yard anymore." He told Richardson that he was "going on protection to get away from him" and broke and ran.

Defendant asked his cellmate, Chris Fischer, to talk to Richardson about the debt and the following afternoon he saw them talking under the shed. He walked into the shed, watching Richardson out of the corner of his eye. Richardson "come up and I assumed that he had a knife in his hand and I had my hammer inside of my coat." (Tr. 299) Richardson came at him with the knife in his right hand and he struck Richardson on the head. He got Richardson's knife and stabbed him. He testified that if he had not stabbed Richardson that when Richardson got out of the hospital, that he would be waiting to kill him.

■ The first proposition asserts that "the trial court erred in allowing the State to endorse additional witnesses after the beginning of the term of court, and failing to grant the defendant's motion for a continuance to allow investigation and rebuttal of the newly endorsed witnesses' testimony." The record reflects that the cause was originally set for trial on October 31, 1972. On October 25, 1972, the State filed a motion to endorse additional witnesses, Tommy Leroy Bacon and Gary Bryant. An order allowing the endorsement of the additional witnesses was signed by the associate district judge with a copy of said application and order mailed to the defendant's attorney. On October 26, 1972, a list of names of witnesses, including the two newly endorsed, was personally served upon the defendant and his attorney. On October 30, 1972, defendant filed a motion for continuance, asserting that he did not have sufficient time to confer with the additional witnesses. The record before this Court does not reflect that the trial court ruled on defendant's motion for continuance. The record does reflect that the trial was not held until November 6, 1972, some twelve days after the defendant was served a list of the State's witnesses. In Severs v. State, Okla.Cr., 477 P.2d 695, we stated:

"We are not persuaded that the order endorsing additional witnesses five days before the trial was set denied the defendant sufficient time to properly prepare for his defense. It will be noted that Art. 2, § 20, of the Oklahoma Constitution provides that in capital cases

the defendant shall be furnished with a list of witnesses at least two days before the case is called for trial. Clearly this provision has been complied with in the instant case. Thus we find no merit to the contention that the trial court erred in denying the motion for continuance for the reason of endorsing additional witnesses five days before the case was set for trial. See, Born v. State, Okl.Cr., 397 P.2d 924 (1964)."

We therefore find this proposition to be without merit.

■ The second proposition contends that the trial court erred in admitting a purported letter from the defendant to Gary Bryant without requiring the proper identification and foundation for the same. Defendant cites as authority Goben v. State, Okl.Cr., 201 P. 812, wherein this Court held that a letter found in the bottom of a trunk of clothes was inadmissible because it was not dated, not addressed to a specific person, not signed, not a statement in writing made by the defendant and not shown that it was written before or after the homicide. We are of the opinion that the instant case is distinguishable from Goben, supra. In the instant case, the letter was addressed to a specific person "Possum." The record clearly reflects that Gary Bryant's nickname was "Possum." Defendant's witness Ronnie Scott testified on direct examination as follows:

"Q. Okay, who was with you when you escaped?

"A. Gary Bryant.

"Q. Gary Bryant. Do you know if he has a nickname?

"A. Yes, sir, Possum." (Tr. 174)

We next observe that the letter was signed by a specific person, "Archie." The majority of the inmate witnesses referred to the defendant as "Archie." The defendant himself testified as follows:

"Q. Will you state your name for the record please?

"A. George Stidham.

"Q. They call you Archie?

"A. Yes, sir." (Tr. 289)

We further observe that the addressee of the letter, Gary Bryant, alias Possum, identified the handwriting of the letter as being defendant's. Bryant testified that he knew the defendant approximately six years and at one time was the defendant's cellmate. He observed the defendant writing letters and was familiar with the defendant's handwriting as a result of helping the defendant write letters and having received letters from the defendant. In the early case of Archer v. United States, 9 Okl. 569, 60 P. 268, the court stated:

"In Arthur v. Arthur, 38 Kan. 691, 17 P. 187, the supreme court of Kansas, in our judgment, correctly states the rule as to the modes of proving the genuineness of a signature to a written instrument when denied under oath, thus: 'Before a witness can be permitted to testify to the signature of a written instrument when the execution thereof is denied under oath, it must be shown: First, that the said witness was present, and saw the instrument executed; or, second, *that he was acquainted with the writing and signature of the party*; or, third, that such witness is competent to testify to the genuineness of such signature by a comparison with other writings or signatures admitted or proven to be genuine.'" (Emphasis added)

We thus conclude that the trial court properly admitted the letter for the jury's consideration. Although defendant did not specifically deny writing the letter in his testimony, Defendant's Exhibit 1 was introduced for the purpose of comparison with State's Exhibit 1.

■ The final proposition asserts that the trial court erred in instructing the jury as to death penalty when the death penalty had already been ruled to be violative of defendant's constitutional rights by the United States Supreme Court. Defendant argues that such instructions could not help but inflame the passion of the jury to find against the defendant, whether or not they found for death. In view of the over-

whelming evidence of defendant's guilt and the verdict of the jury, we are of the opinion that the defendant was not prejudiced by the court's instruction. The judgment and sentence is affirmed.

BLISS, P. J., concurs.

BRETT, J., concurs in results.